Jimmy Lee CLARK, Petitioner-Appellant,

v.

Arnold R. JAGO, Respondent-Appellee.

No. 81–3042.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 14, 1981.

Decided April 23, 1982.

Rehearing Denied Aug. 31, 1982.

---

Albert L. Purola, Willoughby, Ohio, for petitioner-appellant.

Richard David Drake, Asst. Atty. Gen., Columbus, Ohio, for respondent-appellee.

Before KEITH and MARTIN, Circuit Judges, and DUNCAN, District Judge.*

DUNCAN, District Judge.

Jimmy Lee Clark was convicted of aggravated murder and aggravated robbery after a trial by jury in the Court of Common Pleas for Lake County, Ohio. Although the jury found one of the Ohio statutory crite-

ria for the imposition of the death penalty to have been met,[1] the Court found a mitigating circumstance[2] and sentenced Clark to life imprisonment for aggravated murder and to a term of seven years imprisonment for aggravated robbery. The sentences are to be served consecutively.

This appeal from the District Court's dismissal of Clark's petition for habeas corpus under 28 U.S.C. § 2254 presents important Fifth, Sixth, and Fourteenth Amendment questions. We believe the petition should not have been dismissed.

I. The Jury Instructions

A

Appellant's challenges to the instructions regarding aggravated murder were rejected by the Ohio courts, including the Supreme Court of Ohio, *State v. Clark*, 55 Ohio St.2d 257, 379 N.E.2d 597 (1978). Clark's petition for a writ of certiorari was denied by the United States Supreme Court. *Clark v. Ohio*, 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).[3] For the reasons discussed below, we find that appellant's Due Process rights were violated by the jury instructions and accordingly reverse the judgment of the District Court.

The Supreme Court of Ohio summarized the facts developed during the course of Clark's trial as follows:

On the morning of December 7, 1975, appellant, Jimmy Lee Clark, and a companion, Willie Jones, drove from Cuyahoga County to a gas station located just off Interstate 90 in Lake County. Upon their arrival the two men entered the gas station and confronted the attendant, Joseph H. Bradshaw, who was sitting on a stool in the front office. When Jones produced a handgun, Bradshaw reached into his pocket and gave Jones his money. Appellant and Jones then ordered Brad-

---

* The Honorable Robert M. Duncan, Judge, U.S. District Court for the Southern District of Ohio, sitting by designation.

1. Section 2929.04, Ohio Revised Code, (effective January 1, 1974, but subsequently amended). See also *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

2. The Court found that Clark was mentally deficient and that the crime of murder was primarily produced by this deficiency. Jt.App. p. 5. R.C. 2903.01 and R.C. 2911.01.

3. Three Justices voted to grant the writ.

shaw back into the bay area of the gas station, where Bradshaw was made to lie on the floor while his coin and wallet were removed. Thereafter, appellant went into a back room and removed some coins from a money box. Following this, Jones marched Bradshaw into the back room, from which appellant heard the sound of two gunshots as he was exiting the back room. Appellant and Jones then departed in their vehicle, and soon afterward Bradshaw was discovered lying dead, face down in the back room, with bullet wounds in the head and neck.[4]

The Court's charge, of course, has been reviewed in totality;[5] we find the following parts pertinent:

Before you can find the Defendant guilty of aggravated murder you must find beyond a reasonable doubt that Joseph Bradshaw, Jr. was a living person; that his death was caused by the Defendant in Lake County, Ohio on or about the 7th day of December, 1975; that the killing was done purposely and that the killing was done while the Defendant was committing aggravated robbery.

Purpose to cause the death of another is an essential element of the crime of aggravated murder. A person acts purposely when it is his specific intention to cause a certain result. *It must be established in this case that at the time in question there was present in the mind of the Defendant and/or his accomplice a specific intention to cause the death of Joseph H. Bradshaw, Jr.*

An accomplice is a person who knowingly aids, abets, assists, encourages or directs or associates himself with another in the commission of a crime and he is regarded as if he were a principal offender and is just as guilty as if he personally performed every act constituting the offense. This is true even if such person was not physically present at the time the crime was committed. When two persons have a common purpose to commit a crime and one does one part and a second performs another, those acting together are equally guilty of the crime. Section 2923.03 of the Ohio Revised Code entitled Complicity reads in part as follows:

"No person acting with the kind of culpability required for the commission of an offense shall do any of the following: Aid or abet another in committing the offense."

Before you can find Jimmy Lee Clark guilty of aggravated murder in the first count of the indictment you must find beyond a reasonable doubt that he aided, abetted, assisted or encouraged another, Willie Jones, to purposely cause the death of Joe Bradshaw, Jr.

A person acts purposely when the jist of his offense is a prohibition against conduct of a certain nature regardless of what the offender intended to accomplish thereby. If it is his specific intention to engage in conduct of that nature he has a conscious objective of producing a specific result of engaging in specific conduct to do an act.

Purpose is a decision of the mind to do an act with a conscious objective producing a specific result of engaging in specific conduct to do an act. Purposely is to do it intentionally and not accidently. Purpose and intention mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. The purpose with which a person does an act is determined by the manner in which it is done, the

4. Clark argues that the Supreme Court of Ohio's summary of the facts is clearly wrong with respect to his location at the time of the actual shooting. As noted above, the Supreme Court wrote: "Jones marched Bradshaw into the back room, from which appellant heard the sound of two gunshots *as he was exiting the back room.*" (Emphasis added.) The record, however, suggests that Clark was either in the getaway car waiting for Jones when he heard

the shots or was on his way to the car. Tr. 51–56. In any event, the precise location of Clark at the time the shots were fired is not significant and will accordingly play no part in the Court's review.

5. The trial court adequately charged on the presumption of innocence, burden of proof, and reasonable doubt as defined in R.C. 2901.05.

weapon used and all of the facts and circumstances that are presented to you in evidence.

. . . . .

While committing aggravated robbery means that the killing must have occurred as part of those acts leading up to or occurring during the commission of the aggravated robbery and that the killing was directly associated with the aggravated robbery. (Emphasis added.)

In addition to the charge on aggravated murder and aggravated robbery, the court instructed the jury to determine whether there was proof of one of the criteria for imposing the death penalty under RC 2929.-04(7). The court stated:

That separate question which you will be called upon to decide is, did the Defendant, Jimmy Lee Clark, purposely cause the death of Joseph Hiram Bradshaw, Jr., while committing aggravated robbery.

After the jury was charged and began deliberation, it requested the court to define aggravated murder and aiding and abetting. The elements of the crime and the complicity statute were again read to the jury.

It should be clearly understood that a review of the constitutional adequacy of jury instructions is far different from a review of the sufficiency of the evidence. Whether there is sufficient evidence to support a conviction for aggravated murder is a question that we need not answer.[6] Rather simply stated, our query is whether the jury charge considered as a whole advised a reasonable juror that the prosecution had the burden of proof of the essential elements of the crime of aggravated murder according to Ohio law. If the charge

could have been interpreted by a reasonable juror to relieve the state of its burden to prove each of the essential elements, then Clark was denied the process that the constitution makes due. *Sandstrom v. Montana*, 442 U.S. 510, 517, 99 S.Ct. 2450, 2455, 61 L.Ed.2d 39 (1978); *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Burton v. Bergman*, 649 F.2d 428 (6th Cir. 1981).

**B**

Ohio has left the company of those jurisdictions which have traditional "felony murder" offenses. In such jurisdictions first-degree murder does not always require proof of an intent to kill. The underlying felony or predicate offense may serve as an intent-divining mechanism which compounded with a homicide supports a first degree or aggravated murder conviction. See *Whalen v. United States*, 445 U.S. 684, 713, 100 S.Ct. 1432, 1449, 63 L.Ed.2d 715 (1980) (Rehnquist, J., dissenting).

Under Ohio law, however, purpose to kill is an essential element of the crime of aggravated murder.[7] *State v. Lockett*, 49 Ohio St.2d 48, 358 N.E.2d 1062 (1976), *reversed on other grounds, sub nom. Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *State v. Clark*, 55 Ohio St.2d 257, 379 N.E.2d 597, *cert. denied*, 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

Both the Supreme Court of Ohio and the Court of Appeals affirmed Clark's convictions, citing *State v. Lockett, supra.* Paragraphs 3 and 4 of the syllabus of *Lockett* are as follows:

3. Where the record in a prosecution for aggravated murder committed during the commission of an armed robbery es-

---

**6.** In affirming the conviction, the Supreme Court of Ohio found the evidence sufficient but did not specifically address the jury instruction question. *State v. Clark*, 55 Ohio St.2d 257, 379 N.E.2d 597, *cert. denied*, 440 U.S. 950, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979).

**7.** R.C. 2903.01(B) and (C) provides:

(B) No person shall purposely cause the death of another while committing or at-

tempting to commit, or while fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.

(C) Whoever violates this section is guilty of aggravated murder, and shall be punished as provided in section 2929.02 of the Revised Code.

tablishes that the participants in the offense entered into a common design to commit the armed robbery by the use of force, violence and a deadly weapon and all the participants were aware that an inherently dangerous instrumentality was to be employed to accomplish the felonious purpose, a homicide occurring during the commission of the felony is a natural and probable consequence of the common plan which must be presumed to have been intended, and such evidence is sufficient to allow a jury to find a purposeful intent to kill.[8]

4. If a conspired robbery, and the manner of its accomplishment, would be reasonably likely to produce death, each person engaged in the common design to commit the robbery is guilty with the principal killer as an aider and abetter in the homicide although not actually present at the time of the homicide, and a purposeful intent to kill by the aider and abetter may be found to exist beyond a reasonable doubt under such circumstances.

In *State v. Scott*, 61 Ohio St.2d 155, 400 N.E.2d 375 (1980), however, the Supreme Court of Ohio emphasized the importance of the element of purpose to kill in situations where a defendant is charged as an aider and abetter. In that case, Scott together with individuals named Moore and LeRoy, initiated a plot to kidnap and hold for ransom a prosperous business figure named Emoff. Emoff was later murdered. Scott was brought to trial, and after the jurors had begun deliberating, the jurors presented the trial court with the following question:

> According to the *law* if a defendant is guilty of kidnapping and the victim is never released alive even though the defendant had no knowledge of nor participation in the murder, by reason of being implicated in the kidnapping is he also guilty of aiding and abetting the murder?

61 Ohio St.2d at 166, 400 N.E.2d at 383. The trial court answered that "[s]uch a defendant is also guilty of aiding and abetting the murder." Rejecting this implicit adoption of the strict felony murder rule, the Supreme Court of Ohio wrote:

> The trial court's affirmative answer would have been correct only if Ohio adhered to the strict felony murder rule. That is, appellant would. be "guilty of aiding and abetting the murder * * * [solely] by reason of being implicated in the kidnapping * * * " only if the *mens rea* requirement for murder could be supplied by the mental element of the underlying kidnapping.

> Ohio, however, does not follow the strict felony murder rule. "[P]urpose to kill is an essential element of the crime of first degree murder in this state." *State v. Lockett, supra* 49 Ohio St.2d at pages 58–59, 358 N.E.2d at page 1070; *Robbins v. State* (1857), 8 Ohio St. 131; *State v.*

---

**8.** The case at bar does not require us to consider any constitutional question that may be presented by the "presumption" suggested by the third paragraph of the *Lockett* syllabus. *Lockett* could be read as establishing a mandatory presumption regarding intent in murder cases involving aiders and abetters; but, the Supreme Court of Ohio has suggested in a subsequent opinion that the *Lockett* syllabus described only a factual basis from which the jury could *infer* a purpose to kill. *State v. Scott*, 61 Ohio St.2d 155, 400 N.E.2d 375 (1980). The trial court in this case did not utilize the *Lockett-Scott* inference in its instructions to the jury. Mr. Justice White alluded to the problem in his concurring opinion in *Lockett v. Ohio*, 438 U.S. 586, 627–28, 98 S.Ct. 2954, 2984–85, 57 L.Ed.2d 973 (1978) when he wrote in the context of his views on the death penalty:

Of course, the facts of both of these cases might well permit the inference that the petitioners did in fact intend the death of the victims. But there is a vast difference between permitting a factfinder to consider a defendant's willingness to engage in criminal conduct which poses a substantial risk of death in deciding whether to infer that he acted with a purpose to take life, and defining such conduct as an ultimate fact equivalent to possessing a purpose to kill as Ohio has done. See *United States v. United States Gypsum Co.* [438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ] Indeed, the type of conduct which Ohio would punish by death requires at most the degree of *mens rea* defined by the ALI Model Penal Code (1962) as recklessness: conduct undertaken with knowledge that death is likely to follow.

*Farmer* (1951), 156 Ohio St. 214, 102 N.E.2d 11. Accordingly, paragraphs three and four of the syllabus in *Lockett* describe the factual basis from which a jury could *infer* appellant's purpose to kill, as required by the aggravated murder statute. See Part VII, *supra.* See also, *State v. Johnson* (1978), 56 Ohio St.2d 35, 38, 381 N.E.2d 637. In effect, the trial court's affirmative answer to the jury question improperly relieved the state of its duty to prove appellant's purpose to kill beyond a reasonable doubt. See *In re Winship* (1970), 397 U.S. 358, 364, 90 S.Ct. 1068 [1072] 25 L.Ed.2d 368. *Id.*

■ Thus, under Ohio law, a defendant's purpose to kill must be proved as an essential element of the crime of aggravated murder even where the prosecution proceeds on an aider and abetter theory.[9] Certainly, purpose to kill may reasonably be inferred from proven facts, and a "non-triggerman" can be convicted under this statute.

### C

The Due Process Clause of the Fourteenth Amendment requires "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [defendant] is charged." *In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1073, 25 L.Ed.2d 368 (1970); *Sandstrom v. Montana*, 442 U.S. 510, 520, 99 S.Ct. 2450, 2457, 61 L.Ed.2d 39 (1978). Thus, the question presented here, as in *Sandstrom*, is "whether the challenged jury instruction had the effect of relieving the State of the burden of proof enunciated in *Winship* on the critical question of petitioner's state of mind." 442 U.S. at 521, 99 S.Ct. at 2458. Under *Sandstrom, supra,* the test employed in reviewing jury instructions involving presumptions was described as follows:

[The] determination requires careful attention to the words actually spoken to the jury . . . for whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror *could* have interpreted the instruction. *Id.* at 514, 99 S.Ct. at 2454 (Emphasis added.)

In contrast to *Sandstrom*, this case does not directly involve the use of a presumption as such. That is, the jury was never instructed that it must or might infer that the defendant had a purpose to kill based upon other facts in evidence. Instead, the jury in this case was instructed that the essential element of purpose to kill could be found in the mind of the defendant "and/or" his accomplice. Nevertheless, the principles articulated in *Standstrom* are equally applicable here. Under *Sandstrom* principles we have no doubt that this isolated portion of the charge relieved the state of its burden to prove that Clark had a purpose to kill the victim.

Our task, however, does not end there. The magistrate's report, which was adopted by the District Court below, recognized the constitutional problem in the trial court's charge. However, the magistrate reasoned that the problematic portion of the charge "within the context of the overall instruction readily reveals that the jury was instructed that it must find petitioner had the purpose to kill if it was to find him guilty of aggravated murder." Jt.App. 27. We agree that a review of the complete charge is required. *Cupp v. Naughten*, 414 U.S. 141, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973). We disagree with the magistrate's conclusions, however.

The portion of the charge on the elements of aggravated murder read as follows:

**9.** R.C. 2923.03 provides:
　(A) No person, *acting with the kind of culpability required for the commission of an offense,* shall do any of the following:

　　·　　·　　·　　·　　·

　(2) Aid or abet another, in committing the offense;

　　·　　·　　·　　·　　·

(F) Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender. A charge of complicity may be stated in terms of this section, or in terms of the principal offense. (Emphasis added.)

Before you can find the Defendant guilty of aggravated murder you must find beyond a reasonable doubt

[1] that Joseph Bradshaw, Jr. was a living person;

[2] that his death was caused *by the defendant* in Lake County, Ohio on or about the 7th day of December, 1975;

[3] that the killing was done purposely;

[4] and that the killing was done *while the defendant* was committing aggravated robbery.

Conspicuously absent from number [3] above was a requirement that the killing was done purposely *by the defendant.*

Next, the jury was instructed that "it must be established that at the time in question there was present in the mind of the defendant and/or his accomplice a specific intention to cause the death." After a very general definition of the term "accomplice," the court read R.C. 2923.03 in part as follows: "No person acting with the kind of culpability required for the commission of an offense shall do any of the following: aid or abet another in committing the offense." Next, the court stated in effect that if Clark aided or abetted Jones to purposely cause the death of the victim he could be convicted of aggravated murder. Nowhere does the court make clear that Clark's "culpability" or mental state cannot automatically be that of Jones. The jurors were never told that Clark's culpability, whether established by direct proofs or by the *Lockett-Scott* inference must be first established before he can be an aider or abetter or an accomplice to aggravated murder.

Finally, the trial court instructed the jury concerning one of the criteria for the imposition of the death penalty under R.C. 2929.-04(7). The court explained:

That separate question which you will be called upon to decide is, did the Defendant, Jimmy Lee Clark, purposely cause the death of [the victim] . . . .

This is the only portion of the entire charge which specifically required a finding of purpose to kill on the part of Clark. We believe, however, that an instruction requiring purpose to kill on the "separate question" of penalty did not cure the ambiguities on the basic aggravated murder charge discussed above.

If the trial judge was attempting to charge based on the law of *Lockett,* the mark was missed. The essential ingredients of the *Lockett* mechanism for the inference of purpose to kill were not provided to the jury. That is, the jury was never told that it might infer Clark's purpose to kill if "the participants in the offense entered into a common design to commit the armed robbery by the use of force, violence and a deadly weapon and all the participants were aware that an inherently dangerous instrumentality was to be employed . . . ." [10] *Lockett v. Ohio, supra.* While we commiserate with the plight of an Ohio trial judge faced with the difficulty in charging a jury on aggravated murder under Ohio law, it is not impossible.

Upon review of the entire charge, we are convinced that the words "actually spoken to the jury," *Sandstrom, supra,* 442 U.S. at 514, 99 S.Ct. at 2454, could have been interpreted by a reasonable juror in an improper manner. The charge could easily have been interpreted to mean that Clark, personally, did not have to have purpose to kill, and that Jones' purpose was sufficient to convict Clark, even if not shared by Clark.

We are also convinced that the erroneous jury instruction was not harmless error. In *Burton v. Bergman,* 649 F.2d 428 (6th Cir. 1981), Burton was convicted in a Michigan state court of assault with intent to commit murder. At trial, the Court instructed the jury that "the law presumes that any ordinary human being intends the ordinary consequences of his or her acts." *Id.* F.2d at 430. Applying *Sandstrom,* this Court concluded that "the trial court's instructions created a substantial risk that the jury would believe the presumption provided the

---

**10.** As noted above, our decision today does not require us to pass upon the presumption or inference suggested by *Lockett.* See note 8, *supra.*

necessary proof of petitioner's intent beyond a reasonable doubt." *Id.* F.2d at 431. We also rejected the respondent's argument that the erroneous instruction was harmless. Here, as in *Burton,* the inference that Clark had the purpose to kill the gas station attendant was "by no means inescapable." *Id.* at 432. We accordingly conclude, consistent with *Burton,* that "[i]f the trial court had refrained from giving the improper instruction, the jury might have entertained a reasonable doubt [that Clark had a purpose to kill the victim]. Such an error cannot be harmless." *Id.*

■ Our decision is a narrow one. Again, we do not suggest that there was insufficient evidence in the record from which the jury could permissibly infer that Clark had a purpose to kill the victim. We hold only that where purpose to kill is an essential element of the crime of aggravated murder, a jury instruction permitting that element of culpability to be found in either the defendant or his accomplice is violative of the principles of Due Process under the Fourteenth Amendment.

## II. Clark's Statements to Police

### A

Clark made a total of four incriminating oral statements to Willoughby, Ohio, police officers. The first and second statements were made at a Cleveland, Ohio, police station. The third statement was made at the Arco gas station where the robbery and murder took place. The fourth statement was made at the Willoughby police station. After granting defendant-appellant's pretrial motion to suppress the second and third statements, the state trial court admitted into evidence the first and fourth statements. At the hearing on the motion to suppress, the facts surrounding Clark's statements to the police were developed.

However, noticeably absent from the record are many findings of fact or analysis of the applicable law.

We conclude that this absence of fact finding coupled with our doubt as to whether the state trial court used the proper legal standards of waiver requires remand for further proceedings by the District Court.

### B

The following facts are evident in the record.[11] Clark was arrested by Cleveland police officers on December 12, 1975, at approximately 8:00 a. m. on an aggravated robbery charge which was unrelated to the crimes for which Clark was convicted below. At the time of his arrest, Robert Tonne, a Cleveland police officer, allegedly gave Clark the *Miranda* warnings. Clark testified that he was not given his rights when arrested, but was later given the rights at the police station. Clark apparently made no statements on the day of his arrest.

On the morning of the next day, December 13, 1975, Clark was interrogated by Cleveland police officers Tonne and Gibbons. Tonne testified that Gibbons gave Clark the required *Miranda* warnings prior to questioning. Clark testified that he was not given his rights but he asked for an attorney. Clark said he knew nothing about the robbery for which he had been arrested and did not wish to talk to the officers.[12] Clark was then returned to his cell block.

The Cleveland police officers, Tonne and Gibbons, went to the scientific investigation unit where they "bumped into" Willoughby police officers Collins, Reeves and Eisele. The Cleveland officers learned that one of Clark's fingerprints had been found on a cash box at the scene of the homicide for which Clark was eventually convicted. The

11. In the following discussion, certain facts are evident in the testimony of the police officers. In many instances, Clark's testimony conflicts with that of the officers. This description of the facts is not meant to bind the District Court in its treatment of the facts on remand.

12. Cleveland police officer Gibbons stated as follows: (Tr. 102–103)

Q. Did you ask him if he wished to talk to you?
A. Yes.
Q. And what was his response?
A. He didn't want to talk to us.

Cleveland officers then returned to the fourth floor and again requested that Clark be brought out of his cell. Clark was confronted with the matching photographs of his fingerprints taken from his Cleveland police files and the scene of the crime. In addition, a Willoughby Municipal Court arrest warrant for aggravated murder was read to him. Clark stated that he "wanted to talk to the Willoughby police officers" who were downstairs in the criminal investigation unit. The Willoughby officers, Collins and Reeves, were sent for and thereafter entered the interrogation room. The Cleveland officers left the room.

Collins testified that he began advising Clark of his rights and Clark stated that he knew them. Collins nevertheless continued to advise Clark of his rights. Clark agrees that his rights were read to him at this point. According to the officers, Clark responded that he understood, that he wanted to cooperate, and that he wanted to make a statement. The officers claim that Clark said he wouldn't make a written or taped statement, but he was willing to talk about what had taken place. Thereafter, according to Detective Reeves of the Willoughby Police Department, Clark made a statement implicating himself in the robbery of the Arco station. Clark denied that he made a statement. This statement was related to the jury at trial by Detective Reeves. At the conclusion of Clark's statement to the Willoughby police, Clark was again asked if he wanted to put the statement on tape or make a written statement. Clark responded that he did not and requested an attorney. At that point, all questioning of Clark ceased, and according to Detective Collins, Clark was taken back to his cell block.

Detective Eisele's testimony reveals a slightly different version of the facts. Eisele apparently was not present when Clark made the first oral statement, and he testified that when he entered the room Collins requested that the warrant be read and explained to Clark. Eisele read the warrant. Clark asked, "Well, what does that mean?" He was told that he was charged with a capital offense. Clark also asked about the fingerprints, "How can I be sure they are mine?" He was told one was removed from a cash box at the crime scene. According to Eisele, after this conversation Clark was returned to a cell.

Collins and Eisele then went to the jail office and arranged to transport Clark to Willoughby. About 15 minutes later they were given custody of Clark, who, according to the officers, then stated that he wanted to make a statement and cooperate. Reeves and Eisele waited with Clark in the hallway while efforts were made to obtain a "statement room." During this wait, Eisele had conversation with Clark. Eisele claims that he reminded Clark of his rights, explained that he was not required to say anything, and asked what happened to the gun involved in the case. Eisele testified that Clark responded by describing the gun and where it was located. The trial court suppressed this second statement. Clark denied making a statement in the hallway.

A statement room then became available. Clark was again advised of his rights by the typist in the statement room. After being advised of his rights, Clark refused to sign a written waiver and again requested an attorney. Detective Tonne made efforts to obtain a public defender in the same building, but an attorney was not available. The questioning of Clark was terminated.

The Willoughby police then placed Clark in a vehicle for transportation to Willoughby. Reeves was the driver and Eisele was in the passenger's seat. Sergeant Collins sat in the back next to Clark. Collins asked Clark if he would mind going to the Arco station on the way back to Willoughby. The officers testified that Clark was again given *Miranda* warnings and thereafter he agreed to go to the Arco station. Clark testified that he told the officers that he didn't want to go to the station. Clark allegedly made a statement to the Willoughby police at the scene of the crime. The trial court ordered this third statement suppressed.

The fourth statement made by the defendant occurred at the Willoughby police station. Clark was given food and proc-

essed by the Willoughby police. Around 2:30 p. m. Clark was in the process of being removed from the cell block for his return to Cleveland. The officers claim that Clark told them that he wanted to make a statement and cooperate. Clark testified that they kept trying to get him to make a statement, but he kept asking for an attorney. Clark then executed a copy of the Willoughby police rights form which included an express waiver of the right to counsel.[13]

According to the officers, after Clark had executed the waiver form, he began bargaining with the police. The police did not yet have the name of Clark's accomplice in the robbery and murder. Clark indicated his willingness to give the name of the accomplice provided he was given written guarantees that his cooperation would be explained to the court. Clark claims he signed the waiver after he was given the assurances. The police sought the assistance of their city prosecutor, Clifton Jones. The questioning of Clark was suspended until Jones arrived. When Jones arrived, Jones again advised Clark of his *Miranda* rights. A tape recorder recorded Jones' advice to Clark. Clark, however, insisted that the tape be turned off prior to making a statement, and Jones complied with the request. After the tape was turned off, Clark again made a statement concerning his involvement in the robbery and murder at the Arco gas station. When Clark was asked to reduce the statement to writing, he requested an attorney and Jones' questioning ceased. Detective Reeves testified to the substance of Clark's fourth statement at trial.

In addition to the above testimony, the trial court had before it evidence that Clark had been given the *Miranda* warnings on prior arrests. Moreover, in response to the trial court's question concerning why Clark had asked for an attorney, Clark responded: "Because I knew if I said—say anything it could be held against me, like—I guess they really wanted me to have no lawyer at the time."

### C

As noted above, Clark made a total of four separate incriminating statements to the Willoughby police. Following a hearing on the defendant's motion to suppress, the trial court suppressed the second and third statements and held that the first and fourth statements were admissible at trial. The state trial court made no express find-

**13.** VOLUNTARY STATEMENT—WAIVER OF RIGHT TO PRESENCE AND ADVICE OF A LAWYER FREE OF [COST TO] ME IF I AM INDIGENT.

Date 12–13–1975 TIME 2:30 PM PLACE Willoughby Police Dept. I, Jimmie Lee Clark am 21 years of age, my address is 9713 Heath Avenue Cleveland, Ohio

I have been cautioned by Det. Laurence M. Reeves who has identified himself as a WILLOUGHBY POLICE OFFICER, and who has warned me as follows:

WARNING

I am a police officer, I warn you that anything you say may be used in a Court of Law against you; That you have an absolute right to remain silent; That you have the right to the advice of a lawyer *before* and the presence of a lawyer here with you *during* questioning, and That, if you cannot afford a lawyer, one will be furnished for you free before any questioning if you desire.

I hereby state that I want to make a statement without a lawyer, that is to say, give up and do without the right to talk to a lawyer and ask his advice before I make a statement, and also I wish to give up and do without having a lawyer present with me during the time when questions are asked me and during the time when I answer those questions. I am willing to make the following statement to the above person, knowing that any statement I make may be used against me in Court and that I have an absolute right to remain silent.

I declare that the following statement is made of my own free will and without anyone having promised me anything or offered out to me any hope of reward, and I make this statement without any fear of physical harm, without anyone having offered to do me any favor and without anyone promising me leniency.

I further state that I am able to read and write the English language and have completed . . . . . . years of school.

SIGNED /s/ Jimmy Clark
WITNESSES /s/ Sgt. Clifford J. Collins
/s/ Det. Laurence M. Reeves

There was some testimony that Clark first attempted to sign the form with his left hand.

ings of fact; nor did the court articulate what precise legal standard of waiver it was employing in analyzing the relevant facts. Moreover, there was no express finding by the state trial court that Clark's statements were made knowingly and voluntarily with an understanding of the rights thereby waived. The state trial court ruled as follows:

> Upon the Defendant's Motion to Suppress Statements made by him on four separate occasions to members of the Willoughby Police Department, as I previously stated, those statements made by him to Detective Eisele on the third floor of the Cleveland Police Station are suppressed. Those statements made by him to Detective Collins, and at the time I am speaking of, Detective Reeves and Detective Eisele might have been present, at the scene of the alleged crime, are suppressed. As to the remaining two instances, the first instance being on the fourth floor of the Cleveland Police Station, specifically in the seargent's [sic] office, the motion is denied; the second instance being in the Willoughby Police Department when Prosecutor Pat Jones was present; that motion is denied.

The opinion of the Court of Appeals of Lake County contains the following statement:

> [T]he record discloses that appellant gave the statements voluntarily after having been advised of his rights. Appellant's willingness to give an oral statement but not a taped or written statement is attributable to his desire to bargain for a reduced charge.

In ruling on the petition for habeas corpus, the district court attempted to reconstruct the facts found by the state courts:

> Although the trial court did not explicitly set forth its reasons for suppressing two of the statements and denying the motion to suppress the other two, it is apparent from the testimony that the two middle statements were suppressed by reason of petitioner's earlier request for an attorney, made initially after his first oral statement at the Cleveland police station. It is also apparent from the testimony that the court denied the motion to suppress the first oral statement on the basis that he had initially waived his *Miranda* rights and did not request an attorney until after his oral statement. It is equally apparent that the fourth oral statement, made in Willoughby, Ohio, on the afternoon of the same day, was not suppressed, despite earlier requests for an attorney, because that statement resulted from petitioner initiating the conversation by voluntarily stating he wanted to cooperate and make a statement, rather than from petitioner being prodded to make a statement by the police.

■ This Court must first consider the relationship between the federal court's review of the factual record and the findings by the state courts.[14] Under normal cir-

---

**14.** 28 U.S.C. § 2254(d) provides in pertinent part as follows:

> (d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—
> (1) that the merits of the factual dispute were not resolved in the State court hearing;
> (2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;
> (3) that the material facts were not adequately developed at the State court hearing;
> (4) that the State court lacked jurisdiction of the subject matter or over the person of the applicant in the State court proceeding;
> (5) that the applicant was an indigent and the State court, in deprivation of his constitutional right, failed to appoint counsel to represent him in the State court proceeding;
> (6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or
> (7) that the applicant was otherwise denied due process of law in the State court proceeding;

cumstances, the findings of the state courts [15] are entitled to a presumption of correctness and therefore considerable deference. The difficulty for the district court below and for this Court on review is the total absence of fact finding. The absence of fact finding by the state courts may require fact finding by the District Court.

In *Elliott v. Morford*, 557 F.2d 1228 (6th Cir. 1977), this Court was faced with a problem similar to this case. Elliott had been tried and convicted in the Tennessee state courts for the murder of a store proprietor. Prior to his trial, Elliott filed a motion to suppress his oral confession. Following a hearing, the trial judge denied the motion to suppress but made no findings of fact to resolve the conflict of testimony. After his conviction, Elliott sought habeas relief. Citing 28 U.S.C. § 2254(d), the district court concluded that the state court's decision was presumed to be correct and that an evidentiary hearing was therefore not required. The Sixth Circuit concluded that the absence of fact finding by the state courts required remand for a hearing in the District Court.

The Fifth Circuit approach to this problem was recently explained in *Harris v. Oliver*, 645 F.2d 327, 330 (5th Cir. 1981). If purely historical facts are found which are uncontaminated by legal error, the federal court may rely on such state findings. Even if no express findings are made it may still be possible for the federal court to rely on facts impliedly found provided that the constitutional claim was decided on the merits. *Townsend [v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) ] recognizes, however, that this inference of factual findings is impossible where the state court has used an incorrect legal standard:

> Reconstruction is not possible if it is unclear whether the state finder applied correct constitutional standards in disposing of the claim. Under such circumstances the District Court cannot ascertain whether the state court found the law or the facts adversely to the petitioner's contentions. Since the decision of the state trier of fact may rest upon an error of law rather than an adverse determination of the facts, a hearing is compelled to ascertain the facts. 372 U.S. at 314 [83 S.Ct. at 758].

.    .    .    .    .

> Of course, under *Rogers v. Richmond*, [365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961) ], a new trial is required if the trial judge or the jury, in finding the facts, has been guided by an erroneous standard of law. However, there will be situations in which

---

(8) or unless that part of the record of the State court proceeding in which the determination of such factual issue was made, pertinent to a determination of the sufficiency of the evidence to support such factual determination, is produced as provided for hereinafter, and the Federal court on a consideration of such part of the record as a whole concludes that such factual determination is not fairly supported by the record:
And in an evidentiary hearing in the proceeding in the Federal court, when due proof of such factual determination has been made, unless the existence of one or more of the circumstances respectively set forth in paragraphs numbered (1) to (7), inclusive, is shown by the applicant, otherwise appears, or is admitted by the respondent, or unless the court concludes pursuant to the provisions of paragraph numbered (8) that the record in the State court proceeding, considered as a whole, does not fairly support such factual determination, the burden shall rest upon the applicant to establish by convincing evidence that the factual

determination by the State court was erroneous.

**15.** The Supreme Court recently explained in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) that the federal habeas court must defer under § 2254(d) to the factual findings not only of the state trial court, but also to any factual findings of state appellate courts. The state appellate court's finding of voluntariness in this case was not a finding of historical fact binding this Court under § 2254(d), but was, instead, a determination of an issue of federal law. *Brewer v. Williams*, 430 U.S. 387, 403, 97 S.Ct. 1232, 1241, 51 L.Ed.2d 424 (1977). Section 2254(d) does not preclude a federal court from reviewing "a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case." *Cuyler v. Sullivan*, 446 U.S. 335, 342, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980).

statements of the trier of fact will do no more than create doubt as to whether the correct standard has been applied. In such situations a District Court hearing to determine the constitutional issue will be necessary.

*Id.* [372 U.S.] at 315 n.10 [83 S.Ct. at 758 n.10].

In this case, the state courts apparently applied a voluntariness standard in addressing Clark's contentions under both the Fifth and the Sixth Amendments. As noted above, the state trial court never expressly articulated what legal standard it was using, but the state appellate court found that the statement was voluntarily made.

█ We believe the state courts' apparent use of a voluntariness standard, without more, creates doubt as to whether the trial court correctly utilized the legal standards for waiver of constitutional rights under the Fifth and Sixth Amendments. In *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Court was called upon to determine whether a defendant had waived his Fifth Amendment right to the presence of counsel. The Court explained:

First, the Arizona Supreme Court applied an erroneous standard for determining waiver where the accused has specifically invoked his right to counsel. It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case "upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. 458, 464 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461] (1938). See *Faretta v. California,* 422 U.S. 806, 835 [95 S.Ct. 2525,

2541, 45 L.Ed.2d 562] (1975); *North Carolina v. Butler,* 441 U.S. 369, 374–375 [99 S.Ct. 1755, 1757–1758, 60 L.Ed.2d 286] (1979); *Brewer v. Williams,* 430 U.S. 387, 404 [97 S.Ct. 1232, 1242, 51 L.Ed.2d 424] (1977); *Fare v. Michael C.,* 442 U.S. 707, 724–725 [99 S.Ct. 2560, 2571–2572, 61 L.Ed.2d 197] (1979).

Considering the proceedings in the state courts in the light of this standard, we note that in denying petitioner's motion to suppress, the trial court found the admission to have been "voluntary," App. 3, 95, without separately focusing on whether Edwards had knowingly and intelligently relinquished his right to counsel.

. . . . .

Here, however sound the conclusion of the state courts as to the voluntariness of Edwards' admission may be, neither the trial court nor the Arizona Supreme Court undertook to focus on whether Edwards understood his right to counsel and intelligently and knowingly relinquished it. It is thus apparent that the decision below misunderstood the requirement for finding a valid waiver of the right to counsel, once invoked.

*Id.* at 482–84, 101 S.Ct. at 1883–1884.

In the case at bar, we cannot glean from the silent state court record whether the trial court believed or disbelieved Clark's assertion that he had requested an attorney when first questioned by the police. If Clark did make such a request, *Edwards* requires the court to focus on whether Clark "understood his right to counsel and intelligently and knowingly relinquished it." *Id.*

Clark also contends that his Sixth Amendment right to counsel had accrued. None of the courts below have considered this claim. If Clark's right to counsel had accrued [16] at the time of his first statement

---

**16.** In view of the lack of fact finding pertinent to the question of whether Clark had been formally charged within the meaning of *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), we intimate no view on this issue. This Court has not yet decided what

constitutes a formal charge. In *Holland v. Perini,* 512 F.2d 99, 103 n.1 (6th Cir. 1975), the Court expressly reserved the question of whether an arrest warrant was sufficient to trigger the Sixth Amendment right to counsel. Other courts have reached different conclu-

to police, waiver of that right must be judged by a high standard. The Supreme Court in *Brewer v. Williams*, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) stated:

> [I]t was incumbent upon the State to prove "an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S., at 464 [58 S.Ct. at 1023]. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant, *Carnley v. Cochran*, 369 U.S. 506, 513 [82 S.Ct. 884, 888, 8 L.Ed.2d 70] *cf. Miranda v. Arizona*, 384 U.S., [436] at 471 [86 S.Ct., 1602 at 1626, 16 L.Ed.2d 694], and that courts indulge in every reasonable presumption against waiver, *e.g., Brookhart v. Janis, supra*, [384 U.S. 1] at 4 [86 S.Ct. 1245 at 1246, 16 L.Ed.2d 314]; *Glasser v. United States*, 315 U.S. 60, 70 [62 S.Ct. 457, 464, 86 L.Ed. 680]. This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pre-trial proceedings. *Schneckloth v. Bustamonte*, 412 U.S. 218, 238–240 [93 S.Ct. 2041, 2053–54, 36 L.Ed.2d 854]; *United States v. Wade*, 388 U.S. [218] at 237 [87 S.Ct. 1926 at 1937, 18 L.Ed.2d 1149].

Elaborating on this standard of waiver, the *Brewer* court further explained, "[W]aiver requires not merely comprehension but relinquishment . . . ." *Id.*

In short, the state court's use of a voluntariness standard raises doubt concerning the application of correct legal standards.

We therefore conclude consistent with the Fifth Circuit's analysis in *Harris v. Oliver, supra*, at 330, that reconstruction of the facts found by the state courts is impossible and that an evidentiary hearing in the district court is required. This approach is consistent with the Supreme Court's seminal decision in *Townsend v. Sain*, 372 U.S. 293, 315, 83 S.Ct. 745, 758, 9 L.Ed.2d 770 (1963): "[T]here will be situations in which statements of the trier of fact will do no more than create doubt as to whether the correct standard has been applied. In such situations a District Court hearing to determine the constitutional issue will be necessary." *See also Pierce v. Cardwell*, 572 F.2d 1339 (9th Cir. 1978).

We fully recognize the principles of comity reflected in the habeas court's obligation to reconstruct the facts impliedly found by the state courts, where such reconstruction is reasonable. We are firmly convinced, however, that on the record before us such reconstruction would be pure speculation. Our jealous respect for important constitutional rights may not be premised on a system of speculative fact finding particularly where, as here, subtle nuances in the facts can have such far-reaching effects.

Because this case must be remanded to the District Court for fact finding, we believe it is expedient to identify other factual issues warranting consideration. When Clark was first questioned by Cleveland police regarding the Cleveland robbery on December 13, 1975, he asserted his right to remain silent under *Miranda, supra*. The Cleveland officers, Tonne and Gibbons, left

---

sions on this question. *United States, ex rel. Robinson v. Zelker*, 468 F.2d 159 (2d Cir. 1972), *cert. denied*, 411 U.S. 939, 93 S.Ct. 1892, 36 L.Ed.2d 401 (1973) (issuance of arrest warrant under New York law is sufficient to trigger Sixth Amendment right to counsel); *cf. United States v. Duvall*, 537 F.2d 15 (2d Cir. 1976) (filing of complaint pursuant to Fed.R.Crim.P. 3 and arrest warrant does not trigger Sixth Amendment right to counsel); *United States, ex rel. Burton v. Cuyler*, 439 F.Supp. 1173 (E.D. Pa.1977) (citing *Zelker, supra*, issuance of arrest warrant under Pennsylvania law is sufficient to trigger Sixth Amendment right to counsel); *cf. Lomax v. Alabama*, 629 F.2d 413, 416 (5th Cir. 1980) (issuance of an arrest war-

rant under Alabama law, absent significant prosecutorial involvement in procuring the warrant, is *not* sufficient to trigger the Sixth Amendment right to counsel). The record in this case does suggest some prosecutorial involvement in obtaining the arrest warrant on the aggravated murder charge. Tr. Vol. I, p. 24. The record before us, however, does not reflect precisely what prosecutorial involvement occurred prior to obtaining the arrest warrant. In order to properly address Clark's Sixth Amendment claim, the District Court may need to hear further evidence on the level of prosecutorial involvement in obtaining Clark's arrest warrant.

the room and Clark was returned to his cell. Very soon thereafter, upon learning that Willoughby police had a warrant for aggravated murder for Clark, the Cleveland officers retrieved Clark from his cell and brought him back to the room for further questioning. An issue somewhat similar to that before the Supreme Court in *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), is presented. In *Mosley*, the defendant was arrested in connection with certain robberies, was given *Miranda* warnings, and elected to remain silent. The police ceased questioning. Over two hours later, a different police officer questioned Mosley at another location about an unrelated holdup murder. He was given fresh *Miranda* warnings and elected to make a statement. The Supreme Court held that the admission of Mosley's statement did not violate his *Miranda* right to cut off questioning. In this case, the district Court on remand should consider the effect, if any, of the relatively short period of time between the cessation of the first questioning and the second meeting with the same Cleveland police officers, albeit concerning different charges. The District Court should also consider other factual distinctions between this case and *Mosley*. Moreover, in the event Clark did invoke his right to remain silent, was his oral statement made thereafter of his own initiative, or was he interrogated? See *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). We emphasize that we intimate no view concerning the significance of these factors on the District Court's determination on remand.

Although we believe the proper determination of the admissibility of the first statement is a key threshold decision, even if it is deemed to have been unconstitutionally obtained, Clark's fourth statement may be admissible under certain circumstances. If the District Court finds that the fourth statement was a product of Clark's initiative and given without interrogation, it may be admissible. See *Edwards v. Arizona, supra.* However, the psychological effect, if any, on Clark after having made the first statement also is significant in determining

the lawfulness of the fourth statement. After an accused has let the cat out of the bag by confession, no matter what the inducement, he may not thereafter be free of the psychological and practical disadvantages of having confessed. *United States v. Bayer*, 331 U.S. 532, 540–541, 67 S.Ct. 1394, 1398–1399, 91 L.Ed. 1654 (1947); *Maglio v. Jago*, 580 F.2d 202 (6th Cir. 1978).

On remand, the District Court must also consider the impact, if any, of the police course of conduct throughout the day prior to Clark's alleged initiation of the fourth statement to police. Finally, the District Court should consider the appellant's age, education, mental state, and all other well-known criteria relevant to the determination of intent and volition to waive constitutional rights. *Fare v. Michael C.*, 442 U.S. 707, 724–725, 99 S.Ct. 2560, 2571–2572, 61 L.Ed.2d 197 (1979); *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

There is, of course, evidence in the record which may lead the District Court to the conclusion that waiver of both the Sixth Amendment right to counsel and *Miranda* rights was established. Clark's refusal to sign a written waiver does not preclude a finding of waiver. *North Carolina v. Butler*, 441 U.S. 369, 375 n.5, 99 S.Ct. 1755, 1758 n.5, 60 L.Ed.2d 286 (1979) (and cases cited therein).

We remand this case with reluctance with full respect for our obligation to defer to the findings of the state courts. On this record, however, there are simply no findings to which we can defer and substantial uncertainty that the correct legal standards were used. Moreover, neither the state courts nor the court below have expressly considered whether the appellant's Sixth Amendment right to counsel had accrued.

### III. The Double Jeopardy Claim

Appellant's final claim is that his right to be free from double jeopardy under the Fourteenth Amendment has been violated by his consecutive sentences on the aggravated robbery and aggravated murder con-

victions. Clark was sentenced to a term of life imprisonment for the crime of aggravated murder and to a term of from seven (7) to twenty-five (25) years imprisonment for the crime of aggravated robbery. He contends that this amounts to multiple punishment for the same crime.

In view of the Court's disposition of the appellant's claim concerning the aggravated murder conviction, the appellant may not be incarcerated on the aggravated murder conviction unless the state elects to retry him. Appellant's claim of double jeopardy is therefore moot. If petitioner is convicted again on the aggravated murder charge, the state court will have an opportunity to consider appellant's double jeopardy claim in light of *Whalen v. United States*, 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980) prior to sentencing. We intimate no view on the merits of appellant's double jeopardy claim.

### Conclusion

The District Court is directed to order that Clark be released from custody on the aggravated murder conviction unless Ohio chooses to retry him within a reasonable time to be determined by the District Court.

Clark is also in custody on his conviction for aggravated robbery. The District Court is directed to hold an evidentiary hearing on the question of whether appellant's statements to police were constitutionally admissible. Clark will remain incarcerated during the period of the evidentiary hearing pending the District Court's decision. If Clark's statements to police were not constitutionally admissible, the District Court must grant the writ as to the aggravated robbery conviction as well.

Accordingly, the judgment of the District Court is reversed and the case is remanded.