793 F.2d 1294
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
CURTIS MALTON, Petitioner-Appellant
v.
RONALD C. MARSHALL, Respondent-Appellee.
 85-3493
 United States Court of Appeals, Sixth Circuit.
 5/9/86
 
 AFFIRMED
 N.D.Ohio
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO
 Before: LIVELY, Chief Judge; MERRITT and JONES, Circuit Judges.
 MERRITT, Circuit Judge.
 
 
 1
 Appellant Curtis Walton appeals the District Court's denial of his petition for a writ of habeas corpus. Although Walton raises 11 major substantive and procedural issues and a variety of subissues, we find no merit in Walton's contentions. We affirm.
 
 I.
 
 2
 The Ohio Court of Appeals has stated the facts of this case as follows:
 
 
 3
 According to Luther Hayes, defendant [Walton] entered Gene's Beverage Store [in Cuyahoga County, Ohio] where Hayes was working on the morning of March 15, 1981. A few minutes later, codefendant Prentice Jackson entered. Each man pulled out a gun and ordered Hayes into the store's back room. When [Walton] could not open the cash register, he insisted that Hayes open it, and [Walton] then took sixty to seventy dollars from the drawer. Codefendant Jackson ordered Hayes to return to the back room and then Jackson hit Hayes on the forehead with the butt of his gun.
 
 
 4
 Hayes further testified that a man named Tony Warren came into the store and that defendants ordered him to lie on the back room floor. [Walton] then shot Warren behind the ear. Warren's testimony corroborated this account of the events.
 
 
 5
 Hayes stated that a man named Robert Johnson found the store door locked, so he knocked on the window, and [Walton] allowed him to enter. According to Hayes and Johnson, [Walton] shot Johnson in the abdomen and made him lie down in the back room. Then [Walton] put a pillow over Warren's head and shot into the pillow.
 
 
 6
 When people began gathering outside the store, Hayes ran ot of the store and across the street into a delicatessen. Hayes stated that codefendant Jackson followed him and shot him twice in the face. Delicatessen cashier, Alan Holton, testified that [Walton] and [co]defendant Jackson ran after Hayes into the delicatessen. According to Holton, [Walton] had two guns and codefendant Jackson had one. Holton said that Jackson shot him in the forearm as he lifted his arms to protect himself. Holton further testified that immediately after defendants left the delicatesssen, he heard one more gunshot.
 
 
 7
 A police officer testified that he found a male body two doors down from the delicatessen, later identified as Alfred Carroll. A pellet comparison test demonstrated that the pellet taken from Carroll's body was fired from the .38-caliber gun found in codefendant Jackson's possession at the time of his arrest.
 
 
 8
 . . . According to [Walton's] testimony, [he] was working at Gene's Beverage at the time these events occurred. [Walton] stated that Robert Johnson and another male entered the store and announced that it was a 'stick-up'. He claimed that Johnson shot Tony Warren. [Walton] denied having a gun, taking money from the cash register, or shooting any of the other victims.
 
 
 9
 In January 1981, Walton was indicted on one count of aggravated murder, four counts of attempted aggravated murder, one count of aggravated robbery, one count of kidnapping, and one count of having a weapon while under a disability. The state trial court dismissed the kidnapping charge, but the jury convicted Walton of the remaining charges. The court sentenced Walton to consecutive sentences of life (aggravated murder), 7 to 25 years (aggravated robbery and attempted murder), and 2 to 5 years (weapons violation).
 
 
 10
 On appeal, the Ohio Court of Appeals affirmed the conviction, with the modification that the conviction on the weapons charge was merged with the aggravated robbery conviction. The Ohio Supreme Court denied Walton's motion for leave to appeal. On September 13, 1984, Walton petitioned the District Court for a writ of habeas corpus under 28 U.S.C. Sec. 2254 (1982). The matter was referred to a magistrate, and on April 17, 1985, the magistrate recommended denying the petition. District Judge Krenzler adopted the magistrate's recommendation and denied the petition on April 30, 1985.
 
 II.
 
 11
 Walton's most substantial point is his challenge to the sufficiency of the jury instruction on the crime of aiding and abetting in aggravated murder given at his trial. Walton asserts that his aggravated murder conviction must have been based on an aiding and abetting theory since it was found that Jackson's gun fired the killing shot. On this subject, the trial judge instructed the jury as follows:
 
 
 12
 Now, the State claims that the defendants were acting in concert, or aiding and abetting each other in the crimes charged in the indictment.
 
 
 13
 I will define what aiding and abetting is for you at this time. The statute reads that the person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender.
 
 
 14
 A person who knowingly aids, helps, or encourages another in the commission of a crime is regarded as if he were the principal offender in each one of those actions, and is just as guilty as if he were personally performing each act which constitutes the crimes charged in those indictments.
 
 
 15
 This is even true if such persons are not even physically present at the time the crime was committed if they had entered into some plan or scheme to commit that crime.
 
 
 16
 To support a charge of aiding and abetting in the commission of a criminal act, the acts alleged as the basis for such charge must have been performed by the accused with knowledge of the fact that he was acting in furtherance of an unlawful purpose, and, where such acts, standing alone, are in furtherance of completely lawful purpose, suspicion that the product of such acts will be unlawfully used is not sufficient to make such person an aider and abettor in the crime where such product is later used.
 
 
 17
 You are instructed that under the laws of the State of Ohio, no person can aid or abet another in committing an offense unless that person is acting with the same kind of culpability required for the commission of an offense.
 
 
 18
 In other words, an accused cannot be found guilty of the crime alleged in the indictment as an aider and abettor until the prosecution has established beyond a reasonable doubt that the claimed principal was guilty of the same offense.
 
 
 19
 (Emphasis added.)
 
 
 20
 You are further instructed that in order to convict one as an aider and abettor in the commission of a criminal offense it must be established by proof beyond a reasonable doubt that the defendants advised, hired, initiated, commanded or counseled as a co-conspirator or had some connection with the transaction preceding the occurrence other than merely seeing the crime being committed. Again, here presence at the scene of an offense is not sufficient.
 
 
 21
 Ohio does not adhere to the strict felony murder rule under which intent to kill may be inferred from the perpetrator's intent to commit the underlying felony. State v. Lockett, 49 Ohio St. 2d 48, 358 N.E.2d 1062 (1976), reversed on other grounds sub nom. Lockett v. Ohio, 438 U.S. 586 (1978). Further, 'under Ohio law, a defendant's purpose to kill must be proved as an essential element of the crime of aggravated murder even where the prosecution proceeds on an aider and abetter theory.' Clark v. Jago, 676 F.2d 1099, 1104 (6th Cir. 1982), cert. denied, 104 S.Ct. 2360 (1984).
 
 
 22
 Walton argues that the jury instruction allowed the jury to find him guilty of aiding and abetting in aggravated murder without finding that he had a purpose to kill. At the very least, Walton argues, the instruction on this point was internally inconsistent and would, therefore, have confused the jury, creating a large possibility that the conviction was improper.
 
 
 23
 In support of his argument, Walton points out that the instruction states, '[t]o support a charge of aiding and abetting in the commission of a criminal act, the acts alleged as the basis for such charge must have been performed by the accused with knowledge of the fact that he was acting in furtherance of an unlawful purpose . . ..' Walton argues that the quoted language led the jury to believe that because Walton was acting with the 'unlawful purpose' to commit robbery, such intent satisfied the mental state element for aiding and abetting in aggravated murder. In essence, Walton is arguing that the instruction allowed the jury to apply the felony murder rule to the charge of aiding and abetting in aggravated murder.
 
 
 24
 In Clark v. Jago, supra, we reversed a denial of habeas corpus relief because we found that somewhat similar jury instructions on the mental state required for conviction for aiding and abetting in aggravated murder were improper under Ohio law. The defect in the instructions in Clark was that they allowed the jury to attribute the principal offender's intent to kill to the defendant charged with aiding and abetting. We stated:
 
 
 25
 Nowhere does the court make clear that Clark's 'culpability' or mental state cannot automatically be that of [the principal offender]. The jurors were never told that Clark's culpability, whether established by direct proofs or by Lockett-Scott inference must be first established before he can be an aider or abetter or an accomplice to aggravated murder.
 
 
 26
 Clark, 676 F.2d at 1105.
 
 
 27
 The trial judge appears to have adopted the language of Clark. Immediately after the paragraph containing the language assailed by Walton, the judge state, '[y]ou are instructed that under the laws of the State of Ohio, no person can aid or abet another in committing an offense unless that person is acting with the same kind of culpability required for the commission of an offense.' Thus, the jury was instructed that Walton could not be convicted of aiding and abetting in aggravated murder unless he had the 'same kind of culpability' as that required for committing aggravated murder. Clark equates 'kind of culpability' with 'mental state.' 767 F.2d at 1105. The judge adequately instructed on the mental state required for a conviction for aggravated murder elsewhere in the charge to the jury.
 
 
 28
 We find no error in the jury instruction on this issue. Although the challenged instructions are perhaps not an expertly crafted hornbook on Ohio law concerning the mental state of aiders and abettors, we hold that the instructions adequately informed the jury that it must find that Walton possessed the same intent required for a conviction of aggravated murder, the intent to kill. The instructions did not deny Walton his right to a fair trial as guaranteed by the fourteenth amendment.
 
 
 29
 Even if the instruction were in error, we are convinced beyond a reasonable doubt that any resulting error would be harmless. Chapman v. California, 386 U.S. 18 (1967). If the jury had been instructed, assuming that it was not, that a defendant charged with aiding and abetting in aggravated murder cannot be convicted unless he acted with the intent to kill, the jury would have, we believe, concluded that Walton did have such an intent. The jury would have inferred such intent from Walton's attempts to kill Tony Warren and Robert Jackson just minutes before Alfred Carroll was killed. The jury could not properly infer Walton's intent to kill from Jackson's intent or from Walton's intent to commit the crime of aggravated robbery. However, when two persons act together in shooting four persons (Warren, Johnson, Hayes, and Holton) with apparent intent to kill, the jury may properly conclude that both perpetrators were acting with intent to kill at the time of a fifth shooting (the shooting of Carroll). If the fifth victim dies, the non-trigger man can properly be found to have possessed the mental state required to convict him of aiding and abetting in aggravated murder.
 
 III.
 
 30
 We find no merit in any of the other points Walton raises. He argues that because the District Court accepted the magistrate's report only one day after Walton filed his objections to the report, the District Court must have failed to give his petition the de novo review to which he was entitled under 28 U.S.C. Sec. 636(b)(1) (1982) and Article III of the Constitution. See United States v. Shami, 754 F.2d 670, 672 (6th Cir. 1985). However, District Judge Krenzler had the magistrate's report for 12 days before Walton filed objections, and the judge's opinion states that he gave the petition de novo review. It was not necessary that the District Court read the entire record after Walton filed his objections; the judge could have examined the record earlier, then, after the objections were filed, reviewed only those portions pertinent to the objections.
 
 
 31
 Without further proof, we cannot find that the District Court failed to give the petition de novo review.
 
 
 32
 Walton's next assignment of error concerns the trial court's refusal to grant Walton a mistrial. After jury selection in Walton's trial, but before any evidence was received, the court allowed the jury to view the scene of the crimes. While the jury was at the scene, a bystander approached the jurors and told some of them that Walton was guilty, that he should be convicted, and that the jury should hang him. Walton moved for a mistrial. The trial judge questioned the jurors about the incident and concluded that the jury would still be fair and impartial. The judge therefore denied Walton's motion. Walton cites Goins v. McKeen, 605 F.2d 947 (6th Cir. 1979), in support of his contention that the jury's impartiality must be presumed to have been compromised. We distinguish this case from the situation in Goins. In Goins the jurors read a newspaper article about the petitioner's trial and his plea bargaining negotiations. Knowledge of plea bargaining would be likely to convince the jurors that the petitioner was guilty. In the present case, some of the jurors heard a bystander's statement of the mere conclusion that Walton was guilty. We believe that the jurors in the present case could put aside what they heard and not let it influence their judgment; whereas, the average juror could probably not escape the taint of the newspaper article in Goins. Accordingly, the trial judge's interrogation of the jury and a curative instruction should suffice in the present case, but these measures were insufficient in Goins.
 
 
 33
 Walton argues that he was denied the right to confrontation when the trial judge refused to allow him to cross examine government witness Robert Johnson concerning Johnson's possession of a gun and about Johnson's earlier stay in a hospital. A review of the transcript reveals that the trial court did in fact allow Walton's counsel to cross-examine Johnson extensively on his possession of a gun. Walton suffered no prejudice when the judge finally cut off cross examination on details that had already been covered. The Ohio Court of Appeals held that Walton's questions about Johnson's hospitalization did not go to Johnson's mental capacity. Walton has not offered to prove that Johnson lacked the mental capacity to testify competently. We are unconvinced that the District Court erred in this respect.
 
 
 34
 Walton argues that the evidence presented at his trial was insufficient to support a conviction for aggravated murder. Specifically, he argues that there was no evidence that Alfred Carroll was alive before he was shot and that there was no evidence that the alleged killing of Carroll was purposeful. There was evidence that Carroll died of a gunshot to the head and that a gun found in codefendant Jackson's possession fired the killing shot. Further, there was direct eyewitness testimony that Walton and Jackson purposely shot four people only moments before Carroll is alleged to have been killed. The evidence is sufficient to establish the fact that Carroll was alive immediately before he was shot, that his killing was committed purposefully, and that Walton acted as an aider and abettor of Carroll's killer. Under these circumstances, Walton could properly be convicted of aggravated murder.
 
 
 35
 Walton argues that he was denied due process when the trial court failed to instruct the jury on the lesser included offenses of murder, manslaughter, and felonious assault. The Ohio Court of Appeals ruled that Walton had waived this argument by failing to make a written motion for such an instruction. Walton responds, in essence, that the appellate court may not raise such a waiver sua sponte without an objection by the prosecutor to Walton's oral motion. The decision of the Ohio court to rule sua sponte that Walton had waived this argument did not deny Walton the fundamentally fair trial promised by the fourteenth amendment's due process clause.
 
 
 36
 Walton was tried jointly with codefendant Prentice Jackson. Walton argues that the trial court's refusal to grant him a separate trial denied him due process. He asserts that the Ohio Court of Appeals held that he was entitled to a separate trial because he was charged with a capital crime but that the court held the error of not granting a separate trial to be harmless. Walton cites Ohio cases holding that the failure to separately try a defendant in Walton's situation is reversible error. This, however, does not answer the essential question of whether failure to sever the trial denied Walton his due process rights. The magistrate held that Walton could not show any prejudice resulting from his joint trial, noting that codefendant Jackson did not plead guilty before or after the trial and did not testify, so Walton could not have forced Jackson to testify even if the trials had been separate. We hold that any error resulting from misjoinder was harmless beyond a reasonable doubt. See United States v. Lane, 106 S.Ct. 725 (1986) (misjoinder is subject to harmless error analysis and is not reversible error per se).
 
 
 37
 After his trial, Walton unsuccessfully moved for a new trial, alleging that he had an affidavit from codefendant Jackson to the effect that Jackson, not Walton, was responsible for Carroll's death. Walton claims that the trial court erred in denying his motion for a new trial. The court's denial of Walton's motion for new trial did not deprive him of due process. Jackson's confession, even if it were presented in a new trial, would not rule out the possibility of Walton being convicted of aggravated murder as an aider and abettor. Moreover, in Armstead v. Maggio, 720 F.2d 894, 896 (5th Cir. 1983), the Fifth Circuit addressed this issue on nearly identical facts and held that denial of a motion for a new trial based on newly discovered evidence did not warrant relief by way of a habeas corpus petition (citing Townsend v. Sain, 372 U.S. 293 (1963).
 
 
 38
 Alan Holton identified Walton as one of the perpetrators of the crime by picking his photograph out of a stack of photos. Walton argues that the photograph identification was unduly suggestive and therefore constitutionally invalid. Holton was shown a stack of photos among which were two pictures of Walton: a snap shot of him on a bed and a plastic welfare identification card showing Walton's name. Walton asserts that the stack did not contain two photos of any other person and that the fact that there were two photos of Walton indicates that the identification was improperly suggestive. The government emphasizes that Holton saw and spoke to the perpetrator from a distance of only three or four feet during the commission of the crimes and the government argues that because of Holton's ability to get a clear view of the perpetrator there is little likelihood of irreparable misidentification. See Simmons v. United States, 390 U.S. 377, 384 (1984). We agree.
 
 
 39
 Walton alleges that the indictment returned against him stated counts of aggravated murder and aggravated robbery in the alternative, that is to say that the indictment states, for instance, that the crime of aggravated murder was committed 'while attempting or attempting to commit, or while fleeing immediately after committing or attempting to commit Aggravated Robbery.' Walton requested a bill of particulars, but, he asserts, the prosecutors merely reiterated the allegations in the indictment. According to Koontz v. Glossa, 731 F.2d 365 (6th Cir. 1984), the indictment must apprise an accused of the charge against him sufficiently to allow him to prepare his defense. Under this standard, the indictment and bill of particulars were sufficient.
 
 
 40
 Walton argues that the trial court committed several errors that, although not individually prejudicial to a degree sufficient to warrant granting his petition, cumulatively prevented Walton from receiving a fair trial. See Walker v. Engle, 703 F.2d 959, 963 (6th Cir. 1983). After full review of Walton's asserted cumulative errors, we find no merit in his contention that these errors produced a fundamentally unfair trial.
 
 IV.
 
 41
 We conclude that the errors asserted by Walton, considered separately or cumulatively, did not deprive Walton of his right to a fair trial as guaranteed by the fourteenth amendment. Accordingly, we affirm the District Court's denial of Walton's petition for a writ of habeas corpus.
 
 
 42
 JONES, J. CONCURRING.
 
 
 43
 While I agree with the majority that, in this extraordinary case, the error in the jury instructions was harmless, I believe that the instructions were, nonetheless, in error.
 
 
 44
 Clark v. Jago requires that the jury be instructed that Walton's culpability, or intent to kill, 'must first be established before he can be an aider or abettor or an accomplice to aggravated murder.' 676 F.2d 1099, 1104 (6th Cir. 1982). The majority opinion seems to concede that the trial court's first relevant instruction on this issue, which states that Walton must have been acting 'in furtherance of an unlawful purpose,' does not comply with the Clark mandate. The majority is satisfied, however, by the subsequent paragraph, which instructs the jury that it must find that Walton was 'acting with the same culpability required for the commission of an offense,' in order to convict. I will concede that, had the trial court stopped there, the issue would properly have been put to the jury. In my view, however, the trial court's next paragraph vitiates any curative effect provided by the last quoted instruction:
 
 
 45
 In other words, an accused cannot be found guilty of the crime alleged in the indictment as an aider and abettor until the prosecution has established beyond a reasonable doubt that the claimed principal was guilty of the same offense.
 
 
 46
 (emphasis added.) When one begins a statement with the phrase 'In other words,' it is commonly understood that what will follow is a clarification or restatement of what came before. Thus, I believe the jury would have understood this paragraph to be a clarification of the meaning of 'with the same kind of culpability.' Yet, the paragraph deals with the guilt of the principal as a predicate for Walton's conviction and not with Walton's own culpability. By using the connecting phrase, 'In other words' the court drew the jury's focus immediately away from the correct issue in a way that made the proper instruction ineffective. It is possible that the trial court intended to say 'In addition' instead of 'In other words.' This would have been acceptable, for the offending paragraph is, by itself, a valid rule of law. Nevertheless, it is destructive rather than instructive when presented as a restatement of the prior charge.