OPINION
{¶ 1} Defendant-appellant, Larry Philpot, was indicted by the Franklin County Grand Jury on one count of felonious assault, in violation of R.C. 2903.11, one count of attempted murder, in violation of R.C. 2923.02 as it relates to R.C. 2903.02, and one count of kidnapping, in violation of R.C. 2905.01. Each count included two firearm specifications pursuant to R.C. 2941.141 and2941.145. Appellant's case proceeded to trial by jury with one of his co-defendants, Lorenzo Pryor ("Pryor").[1] The jury convicted appellant of kidnapping, felonious assault and all firearm specifications. Appellant timely appealed his convictions and presents two assignments of error for our review, as follows:
Assignment of Error Number One:
The defendant was deprived of his right to have the jurors apply the correct standard of law to their deliberations when the court failed to properly instruct the jury on the law of complicity and when the prosecutor improperly misstated the law of complicity to the jurors to the prejudice of the defendant.
Assignment of Error Number Two:
The trial court erred when it failed to preserve, as part of the record, the partial, written jury instructions that were submitted to the jury for use during deliberations. The court further erred when it failed to give the jury complete written jury instructions, as requested by the defendant, and elected, instead, to reduce only part of the jury instructions to writing for the jury's use during deliberations since this unfairly emphasized those portions of the instructions.
 {¶ 2} The facts adduced at trial are as follows. On November 2, 2001, appellant was living with Pryor (his uncle) and Pryor's girlfriend, Hilda Shepherd ("Shepherd"), at 415 Taylor Avenue, Columbus, Ohio. Alvin Love ("Love"), the victim, lived in a van that was parked behind the property. According to Shepherd's trial testimony, on that evening, appellant told her that Love was threatening to harm her. She went to Love's van to ask him if he would come to the house so they could "get this straight." (Tr. at 151.) Shepherd considered Love a friend and noted that she had never had any trouble with him. Shepherd testified that when she walked to the van, she carried a knife with her for her protection because she lived in a "really bad area." (Tr. at 151.) As she approached the van, Shepherd noticed Love was inside it and was smoking crack with an individual later identified as Chenise Higgs ("Higgs"). Shepherd asked Love to come to the house to confront appellant so she could confirm whether Love had threatened her. Love walked back to the house with Shepherd. (Tr. at 154.)
 {¶ 3} Shepherd yelled for "[appellant] and them" to come downstairs so she could get confirmation that it was Love who made the threats. She testified, "[f]irst, [appellant] and them was looking at me, said, `[n]o, it wasn't him.' Then he said `yeah' and started swinging on him." (Tr. at 154.) Appellant hit Love numerous times, moving him into the kitchen. Appellant continued to hit Love, resulting in Love slamming into a kitchen window and breaking it. Shepherd could not remember Love fighting back, nor could she estimate the duration of the fight. She noticed blood coming out of Love's nose, and that he did not look like he was able to close his mouth when appellant was punching him. (Tr. at 156.)
 {¶ 4} Shepherd testified that at one point, Love put his hands on Shepherd's throat, "trying to tell me, you know, trying to tell me like, trying to — `help me! help me!'" (Tr. at 158.) Appellant called for Pryor, who was upstairs, and stated, "Love's got Hilda's throat." (Tr. at 159.) Pryor came downstairs and punched Love. Shortly thereafter, Shepherd opened the door so Love could leave. Pryor stood by the door, holding a shotgun and said, "[i]f you go out that door, nigger, I'm going to kill you." (Tr. at 160.) Shepherd admitted that she hit Love with a frying pan at some point during the fight between appellant and Love. (Tr. at 166.)
 {¶ 5} On cross-examination, appellant's trial counsel questioned Shepherd about the inconsistencies between her trial testimony and an audiotape interview conducted by detectives from the Columbus Police Department, which took place on December 3, 2001. The audible portions of this interview were played for the jury and transcribed for the court record.
 {¶ 6} On the tape, Shepherd told police that on the date of the incident, appellant was upset because Love had threatened him. Appellant then left the home to walk to Love's van to confront him, and Shepherd decided to follow him. She talked appellant into going back into the house and then went over to the van alone, with a butcher knife, to talk with Love. Shepherd talked Love into going into the house so he could talk to appellant. When the detectives asked her what the argument was about, Shepherd replied that Pryor accused her of sleeping with Love. (Tr. at 210.)
 {¶ 7} Shepherd told the detectives that as she and Love entered the house, she said to Pryor, "[n]ow Lorenzo, here's Love. Now, what's going on?" (Tr. at 212.) She stated that Pryor called appellant to come and confirm Love's identity. She said that appellant said at first that the individual was not Love, and then he said it was and started hitting him.
 {¶ 8} The interview then turned to the topic of the frying pan. Shepherd claimed that she got the frying pan out to do some cooking. When asked who she hit with the frying pan, Shepherd replied that she meant to hit appellant, but she must have made a mistake and hit Love. She offered that she did not remember hitting Love with the frying pan because she blacked out, she was not taking her medication and her "mind was gone." (Tr. at 215.) Shepherd told the detectives that at some point, appellant took the frying pan away from her. Shepherd did acknowledge that she hit Love with her fist. When asked how Love's face "got all busted up," Shepherd answered "[appellant] and them keep on using their fists." (Tr. at 222.)
 {¶ 9} The detectives also questioned Shepherd about Pryor's use of the shotgun. She said that the shotgun was lying by the doorway, and when Love tried to leave the house, Pryor threatened to kill him with the shotgun. Shepherd stated that Pryor did not hit Love with the gun, but he did hit him with his fists a few times. (Tr. at 229.) At the end of the interview, Shepherd denied bringing Love back to the house so appellant and Pryor could beat him up. (Tr. at 236-237.)
 {¶ 10} Higgs also testified on behalf of the state. She stated that she and Love had been together since about three or four o'clock on the afternoon of the date of the incident, drinking and smoking crack during most of that time. She testified that sometime that night, Shepherd came to the van and asked why Love was throwing rocks at her nephew. Love replied that he had not seen her nephew. Shepherd then asked Love to go to the store with her. He agreed, and the two left. After about five minutes, Higgs realized that Love and Shepherd should have returned by then because the store was located in very close proximity to Shepherd's home. A few minutes later, Higgs heard the sound of glass breaking and exited the van.
 {¶ 11} Higgs walked toward the store but did not see Love. When she approached the alley, Higgs saw Love standing in the window of Shepherd's house. She offered the following testimony about the events that occurred immediately after she spotted Love:
I hollered, Alvin, Alvin. By that time I seen these two guys and the lady. They was pistol-whipping him. One or both of them, the guys had a gun. The lady had a skillet. I'm hollering and Alvin said, `help me, call the police. Chenise, call the police.' About that time they said, about that time they said, `the bitch is going to call the police. Kill the bitch.'
(Tr. at 275). Higgs ran to a Laundromat and used a telephone there to call 911. Higgs testified that by the time the police arrived, Love was swollen, bleeding from the mouth and could not talk.
 {¶ 12} Columbus Police Officer David Berger testified that he was dispatched to 415 Taylor Avenue on the day of the incident. As he approached the house, he heard glass breaking and individuals screaming. He saw Love hanging out of a window. Love had a large amount of blood on his face and it appeared that he had been assaulted. Thereafter, appellant was placed in the back of Officer Berger's cruiser and appeared agitated. (Tr. at 75, 76.)
 {¶ 13} Columbus Police Officer Francis P. Durant came into contact with appellant after he was placed into custody. He testified that appellant voluntarily said that "Love broke into his house, he had a knife and he beat his ass." (Tr. at 82.)
 {¶ 14} Officer Brian Keefe testified that his primary responsibility was to transport appellant after he was placed in custody. In the back of the wagon, appellant volunteered statements regarding what happened in the residence, such as:
That's right. I did this to him. He broke up in my crib, and I killed the motherfucker. All you guys are honkies. I'll kill all you honkies. * * * I did all that stuff. My uncle and his girl done none of it. * * * I did that to him inside the house.
(Tr. at 91.)
 {¶ 15} Upon the conclusion of the state's case, appellant testified on his own behalf. He stated that on November 1, 2001, Love approached appellant with a large pole in his hand, telling appellant that he was going to physically harm Pryor. Appellant later conveyed this threat to Pryor. (Tr. at 371.)
 {¶ 16} According to appellant, on the following evening, appellant was upstairs in the house drinking. He came downstairs and saw Love in the house. Appellant expressed to Shepherd that this was the man who threatened Pryor. Thereafter, Love grabbed appellant's wrists and the two started wrestling. Appellant testified that he broke his right hand loose and hit Love three or four times, which resulted in a cut to his lip. (Tr. at 373.) When appellant hit him with the second punch, Love fell into a window and broke it. When Love got up, appellant noticed a lot of thick blood coming from Love's lip.
 {¶ 17} Appellant smacked Love numerous times with an open hand, which resulted in blood splattering about the room. (Tr. at 374.) He testified that during that time, he did not see his uncle in the immediate vicinity. After he finished smacking Love, appellant reprimanded him about threatening Pryor. He told him to stay on the floor and he would let him out of the house. He put his key in the door to open it and noticed police officers were outside. Then, he shut the door because the police had arrived, and turned around to convey this to Shepherd. (Tr. at 375.) At that moment, he saw Shepherd with the frying pan in her hand Appellant took the frying pan from her and told her not to hit Love with it because she could seriously hurt him. Although he noticed Love was lying in a thicker puddle of blood, he testified that he thought he had prevented Shepherd from hitting Love with the frying pan. (Tr. at 375, 376.)
 {¶ 18} Appellant further testified that at the time he first talked to the police, he believed that he was the only person that hit Love. He acknowledged telling the police to let Pryor and Shepherd go, stating that he was really the one who beat Love. (Tr. at 376.) Appellant asserted that before he admitted to the police that he fought with Love, he did not know that Shepherd had hit Love with the frying pan. He claimed he did not know that Love had been hit with the frying pan until he read his indictment.
 {¶ 19} As a result of his injuries, Love was taken to Grant Hospital Trauma Center, where he spent several weeks in the intensive care unit. Medical records established that Love suffered multiple facial fractures and underwent reconstructive surgery to repair the damage to his face. Additionally, he suffered damage to his breathing passages and initially had to be placed on a respirator. Love was unavailable to testify because, after elective surgery, subsequent to this case, he died of cardiac arrest prior to trial.
 {¶ 20} At the conclusion of the trial, the jury found appellant guilty of kidnapping, felonious assault and the accompanying firearm specifications, and not guilty of attempted murder.
 {¶ 21} On appeal, appellant argues that he was deprived of his right to a fair trial because the jury instructions given by the court were improper. Crim.R. 30(A) provides in pertinent part that "[o]n appeal, a party may not assign as error the giving or failure to give any instructions unless the party objects before the jury retires to consider its verdict[.]" Because appellant did not object to the court's instructions, his failure to raise an objection constitutes waiver, unless plain error can be proved. State v. Franklin (1991), 62 Ohio St.3d 118, 128,580 N.E.2d 1, rehearing denied by (1992), 62 Ohio St.3d 1497,583 N.E.2d 968, certiorari denied (1992), 504 U.S. 960,112 S.Ct. 2315, 119 L.Ed.2d 235; State v. Underwood (1983),3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332. A jury instruction does not constitute plain error unless, but for the error, the verdict would have been otherwise. State v. Long (1978),53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, certiorari denied (1984),465 U.S. 1106, 104 S.Ct. 1608, 80 L.Ed.2d 138.
 {¶ 22} Jury instructions must be read as a whole. State v.Price (1979), 60 Ohio St.2d 136, 141, 398 N.E.2d 772, certiorari denied (1980), 446 U.S. 943, 100 S.Ct. 216, 964 L.Ed.2d 798. "A charge to the jury must be viewed in its totality, and if the law is clearly and fairly expressed, no reversal will be predicated upon error in a portion of the charge." Yeager v. RiversideMethodist Hospital (1985), 24 Ohio App.3d 54, 55, 24 OBR 107,493 N.E.2d 559; Wagenheim v. Alexander Grant Co. (1983),19 Ohio App.3d 7, 19 OBR 71, 482 N.E.2d 955, paragraph 13 of the syllabus; Schade v. Carnegie Body Co. (1982),70 Ohio St.2d 207, 210, 24 O.O.3d 316, 436 N.E.2d 1001.
 {¶ 23} In his first assignment of error, appellant claims that the trial court failed to properly instruct the jury on the law of complicity. Appellant asserts that under the instructions given, the jury could find appellant guilty of complicity if they found he acted purposely in aiding and abetting his co-defendants in committing the underlying offenses, regardless of whether or not appellant acted with the level of culpability required for the commission of the underlying offenses. Additionally, appellant argues that the jury instructions failed to state that in order to convict someone as a complicitor, the guilt of the principal offender must first be established.
 {¶ 24} When instructing the jury on the law of complicity, the trial court stated:
The defendants may be convicted as complicitors. You should find the defendants guilty if you find that the state has proved beyond a reasonable doubt that on or about the 2nd day of November in the year 2001, in Franklin County, Ohio, the defendants acted in complicity to these offenses.
A person must act purposely to be found to be a complicitor or an aider or an abettor. An aider or abettor is one who aids, assists, or encourages another to commit a crime and participates in the commission of the offense by some act, word, or gesture.
"Aid" means to help, assist, or to strengthen.
"Abet" means to encourage, counsel, incite, or assist.
It is no defense to a charge of complicity that no person with whom the defendant was in complicity has been convicted as a principal offender.
The defendants cannot be found guilty of complicity unless the offense was actually committed, but they may be found guilty of complicity in an attempt to commit the offense.
(Tr. at 539-540.)
 {¶ 25} R.C. 2923.03, the complicity statute, states in relevant part:
(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
* * *
(2) Aid or abet another in committing the offense[.]
 {¶ 26} "To support a conviction for complicity by aiding and abetting pursuant to R.C. 2923.03(A)(2), the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." State v. Johnson (2001), 93 Ohio St.3d 240, 245,754 N.E.2d 796. "The mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor." State v. Widner (1982),69 Ohio St.2d 267, 269, 23 O.O.3d 265, 431 N.E.2d 1025. The accused must take some role in causing the commission of the offense. "Mere approval or acquiescence, without expressed concurrence or the doing of something to contribute to an unlawful act, is not an aiding or abetting of the act." State v. Sims (1983),10 Ohio App.3d 56, 59, 460 N.E.2d 672, citing Smith v. State
(1931), 41 Ohio App. 64, 67-68, 11 Ohio Law Abs. 69,179 N.E. 696; State v. Stepp (1997), 117 Ohio App.3d 561, 568,690 N.E.2d 1342.
 {¶ 27} "Without previous connection with the transaction, one is not an aider or abettor unless he knowingly does something which he ought not to do, or omits to do something he ought to do, which assists or tends in some way to affect the doing of the thing which the law forbids; in order to aid or abet, whether by words, acts, encouragement, support or presence, there must be something more than a failure to object unless one is under a legal duty to object." Sims, at 59, quoting Smith, at 68. "Participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed." Johnson, supra, at 245; State v. Pruett (1971),28 Ohio App.2d 29, 34, 57 O.O.2d 38, 273 N.E.2d 884.
 {¶ 28} Appellee argues that the jury instructions given on the law of complicity do not rise to the level of plain error. Specifically, appellee asserts that when considering the instructions as a whole, the jury was advised that in order to find appellant guilty of complicity, they had to find that appellant acted purposefully in aiding and abetting his co-defendants in committing the underlying offenses. In addition, appellee asserts that the jury was clearly informed that in order to find appellant guilty, they must find that the state proved beyond a reasonable doubt all of the elements of the underlying offenses.
 {¶ 29} In support of its position, appellee cites State v.Sanders (2001), 92 Ohio St.3d 245, 749 N.E.2d 274, certiorari denied (2002), 535 U.S. 1036, 122 S.Ct. 1795, 152 L.Ed.2d 653, in which the Supreme Court of Ohio held that the trial court's failure to make clear that complicity to commit aggravated murder necessitates the specific mental state required for aggravated murder did not reach the level of plain error. In reaching this decision, the Supreme Court opined that when reading the jury instructions as a whole, the trial judge instructed the jury that the appellant could only be convicted of aggravated murder if he had the specific purpose to kill the victim. Id. at 264.
 {¶ 30} Appellant relies on Clark v. Jago (C.A.6, 1982),676 F.2d 1099, certiorari denied (1984), 466 U.S. 977,104 S.Ct. 2360, 80 L.Ed.2d 832, and State v. Mabry (1982),5 Ohio App.3d 13, 5 OBR 14, 449 N.E.2d 16, to support his argument that the instructions given relieve the state of its burden to prove the level of culpability of the underlying offenses in order to convict appellant of complicity. In those cases, the trial court erroneously instructed the jury that the requisite mental state of the principal would be sufficient to establish the mental element for conviction of an accomplice for complicity. We find appellant's reliance on Clark and Mabry is misplaced, as the trial court in this case did not instruct the jury that proof of the mental state for the principal offender was sufficient proof of the mental state of an accomplice for complicity.
 {¶ 31} Moreover, appellant's assertion that the trial court should have instructed the jury that in order to convict a complicitor, the guilt of the principal must first be established, is without merit. There was no dispute that Love suffered serious physical harm as a result of the incident and that an offense was actually committed. Additionally, it is no defense to complicity that no person with whom the accused was in complicity has been convicted as the principal offender. R.C.2923.03(B).
 {¶ 32} We agree with appellee's position and reliance onSanders. Upon review of the charge in its totality, we find that the instructions taken as a whole fairly express the law of complicity. The trial court instructed the jury that a person must act purposely to be a complicitor, and that in order to convict appellant of the underlying offenses, they must find all of the elements (including the level of culpability) beyond a reasonable doubt. Based on the foregoing, we do not find that the instructions on the law of complicity reach plain error.
 {¶ 33} Even if we were to find the trial court acted improperly by instructing the jury that they must find appellant acted purposely in order to convict him of complicity, this factor still would not constitute plain error. The mental state of purposefully includes all lesser mental states. R.C.2901.22(E); State v. Cechura (May 8, 2001), 7th Dist. No. 99 CO 74, 2001 Ohio App. LEXIS 2117 at *10, discretionary appeal not allowed by (2001), 93 Ohio St.3d 1418, 754 N.E.2d 263, reaffirmed, on reopening at (May 28, 2002), 7th Dist. No. 99 CO 74. "While proof of purpose is sufficient to prove knowledge, proof of knowledge is not sufficient to prove purpose." State v.Waddell (Aug. 15, 2000), 10th Dist. No. 99AP-1130, 2000 Ohio App. LEXIS, at *24, discretionary appeal not allowed (2000),90 Ohio St.3d 1490, 739 N.E.2d 815, post-conviction proceeding at (Nov. 6, 2001), 10th Dist. No. 01AP-539. Appellant has failed to demonstrate that the jury instructions on the law of complicity were to his detriment, since it imposed an overall greater burden on the prosecution than the law demands. Further, the jury's verdict in finding appellant guilty of kidnapping and felonious assault and not guilty of attempted murder demonstrates their awareness of the culpability elements of the underlying offenses.
 {¶ 34} Appellant next argues under the first assignment of error that the effects of the complicity instructions given were exacerbated by the improper instructions given of the underlying offenses. The court instructed the jury on the kidnapping charge as follows:
Lorenzo D. Pryor and/or Larry Philpot are charged with kidnapping in count one of the indictment. Before you can find Lorenzo D. Pryor and/or Larry Philpot guilty of kidnapping, you must find beyond a reasonable doubt that on or about the 2Snd
day of November in 2001, in Franklin County, Ohio, Lorenzo D. Pryor and/or Larry Philpot by force or threat removed another, to-wit: Alvin Love, from the place where he was found and/or restrained another, to-wit: Alvin Love, of his liberty for the purpose of facilitating the commission of any felony, to-wit: attempted murder and/or felonious assault.
(Tr. at 541).
 {¶ 35} On the felonious assault charge, the court instructed the jury:
Lorenzo D. Pryor and/or Larry Philpot are charged with felonious assault in count three of the indictment. Before you can find Lorenzo D. Pryor and/or Larry Philpot guilty of felonious assault, you must find beyond a reasonable doubt that on or about the 2nd day of November 2001, in Franklin County, Ohio, Lorenzo D. Pryor and/or Larry Philpot knowingly caused physical harm[2] to Alvin Love and/or caused or attempted to cause physical harm to Alvin Love by means of a deadly weapon, to-wit: a firearm or a frying pan. (Tr. at 546). After defining each of the firearm specifications related to the underlying offenses, the trial court further instructed:
Pryor and/or appellant may be convicted of this specification as an aider and abettor.
(Tr. at 543, 544, 546, and 549.)
 {¶ 36} By including both his name and Pryor's together in the instructions relating to the substantive offenses, appellant asserts that jurors were impermissibly allowed to convict appellant as the principal offender if they found that either he or Pryor committed the offense. Also, appellant contends that the felonious assault instruction was improper because it allowed the jury to convict him of felonious assault if they found that he caused mere "physical harm" to Love instead of "serious physical harm" as required by statute.
 {¶ 37} A review of the evidence presented indicates that the jury had before it information with which they could also find appellant guilty as a principal offender as to both the kidnapping and felonious assault offenses. Shepherd testified that appellant repeatedly hit Love in the face. Higgs offered testimony that appellant, Pryor and Shepherd were all hitting Love, and that Love was swollen and bleeding. Appellant himself admitted that he got into a fight with Love, and that he did not let Love leave the home once he realized that the police had arrived. As a result of the fight, Love suffered multiple facial fractures. Based upon this evidence, the jury acted well within its province in reaching its verdict.
 {¶ 38} Further, we disagree with appellant's argument regarding the felonious assault instruction. In State v. Gudger
(Dec. 11, 1990), 10th Dist. No. 90AP-137, 1990 Ohio App. LEXIS 5526, dismissed by, motion overruled by (2000),59 Ohio St.3d 707, 571 N.E.2d 131, we found there was no plain error nor prejudicial error given in the jury instructions given concerning the felonious assault charge. As in this case, the trial court inGudger instructed the jury that they were required to find proof of physical harm rather than serious physical harm as a prerequisite to conviction on the charge of felonious assault. In reaching our decision in Gudger, we noted, "the alleged error was a single isolated omission and taken in that context, it was still clear to the jury that serious physical harm was required to sustain a conviction on this charge." Furthermore, when considering the felonious assault charge in its entirety, we found that the written copy of the instructions submitted to the jury did not contain the error found in the oral instructions.Gudger, 1990 Ohio App. LEXIS 5526 at *8, *9.
 {¶ 39} In this case, we find that there was no plain error in the jury instructions given for the felonious assault charge. Although the court orally instructed the jury that they need only find "physical harm" to reach a guilty verdict, the court cured this statement by then defining "serious physical harm" in both its oral and written instructions. The jury was provided with the written instructions, which defined "serious physical harm" throughout that specific charge. We find that the written instructions cured the oral omission in the felonious assault instruction and plain error has not been demonstrated.
 {¶ 40} The remaining question for our review with regard to appellant's first assignment of error is whether or not appellant was prejudiced by the state's comments on the law of complicity during closing arguments. "The test regarding the prosecutorial misconduct in closing arguments is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant." State v. Smith (1984),14 Ohio St.3d 13, 14, 470 N.E.2d 883. In order to determine whether the prosecution's remarks are so prejudicial as to deny appellant a fair trial, the closing argument must be reviewed in its entirety. State v. Moritz (1980), 63 Ohio St.2d 150, 157, 17 O.O.3d 92, 407 N.E.2d 1268. The prosecution is normally entitled to a certain degree of latitude in its concluding remarks.Smith, supra. However, the verdict will be overturned if the accused was actually prejudiced by the remarks. State v. Lott
(1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, rehearing denied by, stay denied by (1990), 53 Ohio St.3d 706, 558 N.E.2d 62, certiorari denied (1990), 498 U.S. 1017, 111 S.Ct. 591,112 L.Ed.2d 596. "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips
(1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78, certiorari denied (1984), 465 U.S. 1027, 104 S.Ct. 1287,79 L.Ed.2d 689. As such, misconduct is not grounds for reversal unless it is shown that the defendant has been denied a fair trial. State v. Maurer (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 473 N.E.2d 768, certiorari denied (1985), 472 U.S. 1012,105 S.Ct. 2714, 86 L.Ed.2d 728.
 {¶ 41} In this case, the prosecutor's remarks echoed the jury instructions on the law of complicity, which stated that the jury must find that a person must act purposefully in order to be convicted of complicity. The prosecutor also detailed the elements that the jury must find beyond a reasonable doubt in order to convict appellant of the underlying offenses. We find that based on the evidence presented, and for the reasoning previously stated, the prosecutor's statements during closing arguments did not prejudice appellant and therefore appellant was not denied his right to a fair trial.
 {¶ 42} Accordingly, we overrule appellant's first assignment of error.
 {¶ 43} In his second assignment of error, appellant first asserts that the trial court erred by failing to preserve, as part of the record, the partial written jury instructions that were submitted to the jury for use during deliberations. R.C.2945.10(G) provides, in part, "[w]ritten changes and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case."
 {¶ 44} Contrary to appellant's assertion, a review of the record indicates that a time stamped copy of the written jury instructions provided to the jury for use in its deliberations was retained for the record. As such, appellant's first argument under the second assignment of error is without merit.
 {¶ 45} In his second argument under the second assignment of error, appellant contends that the trial court erred by failing to give the jury complete written jury instructions, as requested by appellant, and instead reduced only to writing the substantive offenses for the jury's use during deliberations. He argues that, by only giving the jury written instructions regarding the elements of the offenses, the trial court placed undue influence on the allegations the state was required to prove, without putting equal emphasis on the general instructions, including the state's burden of proof, the definition of reasonable doubt, and the presumption of innocence, which usually benefit the accused. Appellant argues that selecting only the specific offenses to reduce to writing for the jury's use during deliberations was prejudicial and thus he has been denied his right to a fair trial.
 {¶ 46} Crim.R. 30 states that the court need not reduce its jury instructions to writing. Other courts have held that Crim.R. 30 does not preclude a trial court from reducing the jury instructions or part thereof to writing for the jury's use during deliberations. State v. Whitmeyer (1984),20 Ohio App.3d 279,485 N.E.2d 1055, at paragraph two of the syllabus; State v. Karasek 2nd Dist. No. 17408, 2002-Ohio-2616.
 {¶ 47} In City of Columbus v. Bucci (Dec. 20, 1988), 10th Dist. No. 88AP-321, dismissed by, motion overruled by (1989), 42 Ohio St.3d 706, 537 N.E.2d 225, the defendant was charged with multiple criminal offenses. During its deliberations, the jury asked the trial court to repeat the elements of one of the offenses, that being resisting arrest. Over defense counsel's objection, the court had the relevant portions of its instructions typed and sent to the jury. On appeal, the defendant asserted, "[t]he jury overemphasized the written instructions and underemphasized the oral instructions regarding the City's burden of proving guilt beyond a reasonable doubt." Id. at *5. In affirming the trial court's decision, we found that the submission of partial written instructions for one of the underlying offenses as requested by the jury during deliberations did not prejudice the defendant. We noted that the trial court orally defined reasonable doubt, referred to that burden of proof when listing the elements of each offense charged and then reminded the jury of the standard each time it finished listing the elements of an offense. Id. at *6.
 {¶ 48} Karasek, supra, further supports our holding inBucci, supra. In Karasek, supra, the defendant was charged with one count each of felonious assault and assault on a corrections officer. In an effort to avoid any confusion of the elements of the offenses, the trial court prepared a chart listing the elements of felonious assault and assault on a corrections officer for the jury. The trial court showed the chart to the jury during the jury instructions and allowed the jury to use the chart during its deliberations. The defendant argued that because the state had prepared a similar chart during closing arguments, the trial court's chart was a "clear visible indication" to the jury that the trial court agreed with appellee's trial counsel. Further, the defendant asserted that the chart improperly does not mention reasonable doubt or the possibility of a not guilty verdict. Karasek, at ¶ 41.
 {¶ 49} The court of appeals found that the trial court did not err in making the chart for the jury. In reaching its decision, the court reasoned that under Crim.R. 30, a trial court is not prohibited from reducing part of its instructions to writing and sending it with the jury. Whitmeyer, supra. Further, the court found that the appellant failed to establish that she was prejudiced. The court noted that the fact that the jury found the appellant not guilty of felonious assault supports the conclusion that the chart may have been to her benefit.Karasek, supra, at ¶ 42.
 {¶ 50} Additionally, the Eleventh Appellant District has held that, "absent a showing that the trial court's actions were unreasonable, arbitrary or unconscionable, an appellant's claim that the submission of partial jury instructions placed undue emphasis on the charge is without merit." State v. Bragg (June 7, 1991), 11th Dist. No. 90-P-2224, at 15-16; See, also,State v. Dykes (Dec. 17, 1993), 11th Dist. No. 92-L-078, at 25 (The [partial written jury] instructions given were accurate statements of law. Thus, the trial court's actions were in no way unreasonable, arbitrary or unconscionable.
 {¶ 51} We find the foregoing analyses to be persuasive. In this case, the trial court's decision to submit partial jury instructions for the jury's use during deliberations did not violate Crim.R. 30 and did not place any undue emphasis on the specific offenses. The partial instructions submitted to the jury contained correct statements of law, and clearly stated that in order for appellant to be found guilty, the state must prove every element of the charges beyond a reasonable doubt. Additionally, during the oral instructions to the jury, the trial court thoroughly discussed the concept of reasonable doubt and the presumption of innocence. As such, we find no evidence of partiality on behalf of the trial court through its instructions to the jury.
 {¶ 52} Furthermore, we find appellant has not demonstrated that he was prejudiced by the trial court's decision to submit partial instructions to the jury. By way of illustration, the jury found appellant not guilty of attempted murder. The jury's verdict supports the conclusion that the partial jury instructions instead of being prejudicial, were more than likely beneficial. Karasek, supra. Accordingly, appellant's second argument under his second assignment of error is not well-taken.
 {¶ 53} For all of the foregoing reasons, appellant's first and second assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
Bryant and Brown, JJ., concur.
[1] Hilda Shepherd, the third co-defendant, testified on behalf of the state pursuant to a plea agreement.
[2] Although the court initially orally instructed the jury that they need only find "physical harm" to reach a guilty verdict, the court then defined "serious physical harm" in both its oral and written instructions.