OPINION
{¶ 1} Defendant-appellant, Sunshine Varence-Parks, appeals from a judgment of the Franklin County Municipal Court that convicted her of endangering children. For the reasons that follow, we affirm the judgment of the trial court.
 {¶ 2} On May 30, 2005, one of defendant's sons, who was approximately one year old at the time, fell into a bucket of water at defendant's home in Columbus, Ohio. Firefighters, including emergency medical personnel, and police officers were summoned to defendant's home. After emergency medical personnel arrived at the home and assessed the child's condition, they determined that the child had labored respirations. A paramedic then extracted soapy water from the child's airway. After the child's condition was stabilized, emergency medical personnel transported the child to a hospital for further treatment.
 {¶ 3} Shortly after the firefighters arrived at defendant's home, a police officer also arrived. Upon investigation of the home, this police officer, who was later joined by other police officers, discovered a bucket containing water into which defendant's son apparently fell, and also discovered unsanitary conditions in the home. The remaining children were removed from the home later that same day.
 {¶ 4} By a complaint filed on July 1, 2005, in the Franklin County Municipal Court, defendant was charged with one count of endangering children, a violation of R.C. 2919.22(A). The complaint alleged, among other things, that: (1) defendant was the parent or guardian of several minor children; and (2) defendant "create[d] a substantial risk to the health and safety of such child [sic] by violating a duty of care or protection or support, to wit: By providing deplorable living conditions inside the home, leaving the children unattended causing the (1) year old son to drown in a bucket of water." Defendant pled not guilty to the charge and demanded a jury trial.
 {¶ 5} At trial, the state moved to amend the complaint against defendant. Absent objection by defendant, the court granted the state's motion to amend the complaint to allege, among other things, that defendant left the children unattended, thereby causing the one-year-old son to nearly drown in a bucket of water. (Tr. 11-12.)
 {¶ 6} By jury verdict, defendant was found guilty of the charge against her. Thereafter, the trial court convicted defendant of violating R.C. 2929.22(A), endangering children. The trial court imposed a 30-day jail sentence, which it simultaneously suspended. The trial court also placed defendant on probation for one year and ordered defendant to pay court costs. Later, apparently vacating in part its judgment, the trial court issued an entry suspending its imposition of costs.
 {¶ 7} From the trial court's judgment, defendant appeals and assigns two errors for our consideration:
First Assignment of Error
Appellant's conviction is against the manifest weight of the evidence.
Second Assignment of Error
The trial court committed reversible error by providing an incomplete and erroneous instruction to the jury.
 {¶ 8} By her first assignment of error, defendant only challenges whether her conviction is against the manifest weight of the evidence. However, in her argument in support of her first assignment of error, besides asserting that her conviction is against the manifest weight of the evidence, she also asserts her conviction is supported by insufficient evidence. Although defendant's first assignment of error advances only one error, i.e., whether defendant's conviction is against the manifest weight of the evidence, in our disposition of this assignment of error we also shall address whether defendant's conviction is supported by sufficient evidence. See, generally, Catalano v.Pisani (1999), 134 Ohio App.3d 549, 552 (stating that "[a]n appellate court is required to address only those issues that are both assigned as error and briefed"); see, also, App.R. 12(A)(2).
 {¶ 9} When an appellant challenges his or her conviction as against the manifest weight of the evidence, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997),78 Ohio St.3d 380, 386, reconsideration denied, 79 Ohio St.3d 1451;State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387;State v. Group, 98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. As stated in Group:
* * * The question for the reviewing court [in a manifest-weight claim] is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction."
Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. See, also, Thompkins, at 387.
 {¶ 10} Comparatively, when an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997),80 Ohio St.3d 89; Thompkins, supra, at 386; Conley, supra. See, also,State v. Woodward, Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489, 2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428, 2004-Ohio-6585
(observing that in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, "we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime").
 {¶ 11} Former R.C. 2919.22(A)[1] provided:
No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. It is not a violation of a duty of care, protection, or support under this division when the parent, guardian, custodian, or person having custody or control of a child treats the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body.
See, also, R.C. 2901.01(A)(8) (defining "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist").
 {¶ 12} "The existence of the culpable mental state of recklessness is an essential element of the crime of endangering children under R.C. 2919.22(A)." State v. McGee (1997),79 Ohio St.3d 193, at syllabus. Cf. R.C. 2901.21(B) (providing, in part, that when a section defining an offense "neither specifies culpability nor plainly indicates a purpose to impose strict liability, recklessness is sufficient culpability to commit the offense").
 {¶ 13} R.C. 2901.22(C) defines the culpable mental state of recklessness as follows:
A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist.
 {¶ 14} Accordingly, here the state had the burden of proving beyond a reasonable doubt that: (1) defendant was the parent of the children and had custody or control of them; (2) the children at issue were under 18 years of age; (3) defendant created a substantial risk to the health or safety of the children; (4) defendant violated a duty of care, protection, or support; and (5) defendant acted with a culpable mental state of recklessness. See, generally, State v. Adams (1980), 62 Ohio St.2d 151, 153, citing Mullaney v. Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881
(stating that "[t]he state has the burden of establishing all material elements of a crime by proof beyond a reasonable doubt").
 {¶ 15} At trial, the parties stipulated that defendant is the natural mother of the 11 children that were in the home, including the one-year-old child that fell into the bucket of water, and that all of the children were younger than 18 years old on May 30, 2005. (Tr. 45-; 111-112.) Defendant also admitted that the only occupants of the home on May 30, 2005, were herself, her husband, and 11 children. (Tr. 194.)
 {¶ 16} Later, defendant testified that she is the natural mother of the 11 children that were in the home, including the child that fell into the bucket, and that all of the children were younger than 18 years old on May 30, 2005.[2]
Therefore, the issue resolves to whether the state proved beyond a reasonable doubt that defendant, acting with a culpable mental state of recklessness, created a substantial risk to the health or safety of the children by violating a duty of care, protection, or support.
 {¶ 17} Here, according to the state's evidence, shortly after firefighters arrived at defendant's home, police officer James Haley also arrived at the scene. After the firefighters left, Officer Haley remained at defendant's home and radioed for another police officer, Franklin Hall, to respond and Officer Hall later arrived at the scene.
 {¶ 18} While he was in the home, Officer Haley found that the carpet in the living room was "filthy" and "dirt-stained." (Tr. 47.) According to Officer Haley, "the odor inside the room itself smelled of urine and just old food, what I would consider rotten food. The walls — The walls had stuff on them like dirt." (Tr. 47-48.) In the kitchen, Officer Haley detected "[t]he odor of rotten food" and observed cockroaches. (Tr. 49, 58.) Officer Haley also observed dishes piled in the sink and a severely stained floor. (Id.) According to Officer Haley, on the stovetop burner was a pot that contained a solid that appeared to be "grease from a fry daddy." (Tr. 49-50.) After opening the refrigerator, Officer Haley discovered an odor such that "[he] could hardly continue to keep it open." (Tr. 54.) Officer Haley also discovered "mold," "spilled food," and "spoiled food" in the refrigerator. According to Officer Haley, "the condition of the refrigerator would have made any food in there unedible [sic]." (Id.) In the freezer, Officer Haley discovered "spilled food" and, according to Officer Haley, it did not appear that there was any edible food in the freezer. (Tr. 55.)
 {¶ 19} In the back porch that served as a laundry room, Officer Haley discovered clothes piled on the floor and items that he considered trash and papers on the floor with the clothes. (Tr. 50.) Officer Haley also observed a bucket in the kitchen, which apparently had been in the laundry room area. (Tr. 50-51.) According to Officer Hall, this bucket had either plaster or paint around the inside of it, and the bucket appeared to be "a building material bucket used for rehab or something." (Tr. 69.) The water inside the bucket was "brown" and "[t]here was part of the paint and plaster floating in the water." (Id.)
 {¶ 20} In a spare room near the kitchen, Officer Haley found inoperable exercise equipment akin to a workout bench, clothes piled on this equipment and on the floor, and boxes filled "with stuff." (Tr. 56.) In the basement, Officer Haley discovered the smell of dog feces and urine that was "overtaking," and he observed papers, trash, clothing, food, cockroaches, and bones, specifically, chicken bones. (Tr. 57-58.) The basement lights did not work. (Id.)
 {¶ 21} According to Officer Haley, the parents' bedroom itself was "cluttered"; however, it "was somewhat organized." (Tr. 59.) Outside the parents' bedroom, Officer Haley observed car seats, boxes, and clothes, which prevented egress from a door that led to the street. (Id.)
 {¶ 22} As Officer Haley walked upstairs, he detected an odor of urine that "[was] almost overtaking." (Tr. 60.) According to Officer Haley, "[it was] to the point where the detective actually put his tie over his nose when I took him upstairs." (Id.) After reaching the top of the stairs, Officer Haley went to a bathroom that, although it lacked toilet paper beside the toilet, was "somewhat organized" and "seem[ed] as though the best room of the house." (Id.) Outside this bathroom were two toilets that appeared to be used for potty training. One of the training toilets had urine in it and one had feces in it. (Tr. 61.) According to Officer Haley, "[b]oth of them had gnats on top of the water or urine, and it appeared it had been there for a lengthy period of time." (Id.)
 {¶ 23} Officer Haley next inspected a child's bedroom. In this room, Officer Haley found a bunk bed that was split apart into two single beds, and there were no sheets on the beds. (Tr. 62) According to Officer Haley, "[t]he mattresses were stained; whether it was food, urine, dirt, they were stained pretty heavily" and observed that these stains were "basketball size stains * * * throughout the mattress." (Id.) Piles of clothing were on the floor and none of the clothing appeared to be clean. (Tr. 63.)
 {¶ 24} Officer Haley next inspected a middle bedroom. In this bedroom there was bedding on the bed, an adult jacket hung from the closet, and adult shoes were neatly organized beside the bed. (Tr. 64.) After inspecting the middle bedroom, Officer Haley next inspected the last upstairs bedroom. According to Officer Haley, this room had "bunk beds still stacked top on bottom." (Tr. 65.) The beds appeared stained, there was a strong odor of urine, and piles of dirty clothes were on the floor. (Tr. 65-66.)
 {¶ 25} After completing his inspection, Officer Haley went downstairs and asked the children whether they had eaten. (Tr. 67.) Acting in response to the children's answers to this query, Officer Haley ordered pizza for the children. (Id.) However, due to their age, some children were unable to eat pizza. While looking for suitable food for the children who were too young to eat pizza, Officer Haley discovered a bottle that appeared to contain infant formula. However, because the contents of the bottle smelled spoiled, Officer Haley did not use this bottle to feed those children. A search revealed no unopened cans of formula. A next-door neighbor, however, brought formula to share with defendant's children. (Tr. 72-73.)
 {¶ 26} According to Officer Haley, a couple of children wore white socks that were "black," and several children were not wearing shoes or socks and their feet appeared "dirty." (Tr. 71.) According to Officer Haley, the children's clothes were dirty and stained (Tr. 94), and "[m]ost of the children themselves looked as though they hadn't bathed in a little while, days maybe." (Tr. 71.) Also, according to Officer Haley, the children who ate pizza appeared as if "they hadn't eaten in a long time." (Tr. 73.) While the children ate, some mice appeared in the same room where the children were eating. (Tr. 74.)
 {¶ 27} While the children who were old enough to eat pizza ate pizza, Officer Haley began to open a chest freezer that was inside the living room. (Tr. 69-70.) According to Officer Haley, "the odor from inside this freezer, it was unbelievable." (Tr. 70.) Officer Haley observed that the inside of the freezer was "black" and it smelled of "rotten food." (Id.) Officer Haley testified that "[he had] smelled dumpsters better than that freezer." (Id.)
 {¶ 28} At trial, Officer Franklin Hall testified, in part:
Initially when I first entered the home, there was a strong smell, smelled like urine. The carpet had stains on it. There were crumbs along the baseboards of the home and the carpet looked liked possibly food and — just hadn't been swept in a long time. There was mud and dirt along the walls, looked like where people had dirty shoes and leaned up against the walls or kicked the walls. * * *
(Tr. 99.)
 {¶ 29} Officer Hall also testified, in part:
The children had clothes on. They were dirty and soiled. Some of them were wet. I don't remember any of them having shoes on. The ones that had socks on, the socks were really dirty, looked like they had been wearing them in dirt and outside. The shirts were all soiled. Some of them had stains on them that looked like they had been there for awhile [sic].
(Tr. 100-101.)
 {¶ 30} As to the children that wore diapers, Officer Hall observed that "[i]t was obvious that the diapers were — appeared to be full of urine, that you could see the yellowing through the white outer garment and they were very heavy and sagging * * *." (Tr. 101.)
 {¶ 31} While in defendant's home, Officer Hall had an opportunity to view the kitchen. Officer Hall observed that:
* * * The kitchen had a strong — it was a strong odor, kind of — maybe rotting food or just — just a bad odor. The house had — the entire house had, like, a body odor to it. And the kitchen had dirty pots and pans along the sink, and there was dirt all over the floor, dry dirt, that had been — at one time was mud and then dried and was stepped on and moved along the edges.
* * *
The walls had stuff splattered on it and possibly food and other things along the wall. It was pretty dried in certain areas. There was ketchup and it was dried and real hard. The sink was full of dirty dishes. There was [sic] a lot of cockroaches. It was during the day and it's kind of odd to have that many out during the day. They were all along the floor and along the cabinets. Officer Haley opened one of the cabinets one time and they were crawling all over the dishes and glasses that was [sic] in there.
(Tr. 101-102.)
 {¶ 32} Officer Hall testified that he was present when Officer Haley opened the refrigerator in the kitchen. (Tr. 102.) Officer Hall testified:
* * * Before Officer Haley opened it, a couple of the children advised him not to open it. They made a gesture of "don't do that," and when he opened it, there was a bad odor that came out of it, spoiled, rotting; made my eyes water. It was — It almost looked like some type of — it's hard to explain all the stuff that was spilled and splattered in there. And nothing was — didn't have something splattered all over. The smell was pretty bad.
(Tr. 102-103.)
 {¶ 33} During the time that Officer Hall stayed with the children while Officer Haley checked the house, Officer Hall also saw "a lot of bugs and things crawling along the floor." (Tr. 103.) At one point, Officer Hall heard a sound from the laundry room. (Id.) Officer Hall investigated and shined a flashlight into the room. While he was investigating, Officer Hall observed that "there was a mouse in the room — the laundry room, jumping around the clothes." (Tr. 103.) According to Officer Hall, the floor of the room was covered with clothing and the clothing "appeared to be wet and had been laying there for awhile. There was a strong odor of — like, a moldy odor when things are wet for a long time." (Tr. 103-104.)
 {¶ 34} In her defense, defendant offered the testimony of Mr. Greg Davis, a code enforcement officer for the city of Columbus. (Tr. 116.) Mr. Davis testified that in December 2004 he inspected the property where defendant was a tenant. (Tr. 117-118.) According to Mr. Davis, in December 2004, when he inspected the property, he noticed that upon entering the house "there was a strong odor from a severe roach infestation on the property, a leaky roof." (Tr. 118.) Mr. Davis also testified:
* * * Part of the ceiling and walls were coming down from a roof leak, so the front door was in pretty bad shape. It had been kicked in a couple of times. There was gaps. [Sic.] It wasn't weather tight.
Upon inspection, the kitchen tile, part of it was missing. Part of the sections were [sic] missing. The kitchen stove, oven door was missing, and I believe we had no smoke detectors. And I think that as about it.
(Tr. 118.)
 {¶ 35} Following this inspection, the property owner was notified of housing violations. (Tr. 119.) No response was received from the property owner despite several attempts at contacting the property owner. (Tr. 119-120.) In February 2005, the property was re-inspected. (Tr. 120.) Because the housing violations had not been corrected, a complaint was later filed against the property owner. (Tr. 121.) In March 2005, the property owner appeared before the Franklin County Environmental Court. (Tr. 122.) According to Mr. Davis, at the time of this court proceeding, the property owner had done "very, very little" to correct any deficiencies. (Id.) In April 2005, the property was again re-inspected; at that time the property owner had remedied some of the problems, but the property still was not in full compliance with housing codes. (Tr. 122.) According to Mr. Davis, another court date was then scheduled for June 1, 2005, and at this hearing the property owner was purportedly found guilty and fined. (Tr. 123; 131.)
 {¶ 36} Mr. Davis also testified that on occasions when he was at defendant's home, he was able to observe defendant's children. (Tr. 128.) According to Mr. Davis, the children "[l]ooked like normal kids" and he did not ever notice any problems with the children. (Id.) Additionally, Mr. Davis also testified that in the area of defendant's home, roach and mice infestations were common because of the proximity of abandoned parking lots that have high grass and weeds. (Tr. 133.) According to Mr. Davis, an exterminator had visited the property twice to exterminate any mice and roaches. (Id.)
 {¶ 37} Mr. Davis also noted that on May 31, 2005, he re-inspected defendant's home. (Tr. 130.) According to Mr. Davis, on that date, he did not perform a complete house inspection (Tr. 140), and the scope of this re-inspection was to inspect the problems observed in the original inspection of December 2004. (Id.) On that occasion he did not go to the second floor of defendant's home (id.); he did not see any roaches, (id.); he did not see any mice (Tr. 141); and, at trial, he did not recall detecting any odor when he inspected defendant's home on May 31, 2005. (Tr. 143.)
 {¶ 38} Defendant also testified in her own defense. Defendant testified that she has 11 children; that her oldest child is 13 years old; and that on May 30, 2005, her youngest children, who are twins, were three weeks old. (Tr. 147.) According to defendant, on May 30, 2005, she left the house very early to look at motorcycles with her sister, who was interested in purchasing a motorcycle, and she did not return to the house "until evening, close to dinner time * * * about 4:30, five o'clock, in that time frame." (Tr. 151.) When she returned home, defendant's husband, children, and defendant's brother were at home. (Tr. 152-153.)
 {¶ 39} Upon returning home, defendant checked to determine if all of her children were at home. (Tr. 156.) After finding that the older children were at home, defendant went to check on the infant twins. (Tr. 156-157.) Following defendant's arrival at the home, defendant's husband and her brother left the house to play basketball. (Tr. 153.)
 {¶ 40} According to defendant, on the day that her son fell into the bucket of water, there had been a problem with the washing machine. (Tr. 158.) Defendant testified:
The problem was, there is a piece that connects the drain piece; the hose goes into that, drains the water out on the spin cycle. Well, that piece was broken off, so it couldn't drain. Not that the washing machine was broke [sic], but there would be no place for the water to go down. So that was the problem.
(Id.)
 {¶ 41} According to defendant, the landlord was aware of this problem with the washing machine and was in the process of fixing the problem. (Tr. 158.) Defendant testified that "a five gallon old paint bucket" was being used to hold the water that drained from the washing machine. (Tr. 159.) According to defendant, during a regular wash cycle, she would need to empty the bucket approximately "three and a half times." (Tr. 160.) Defendant stated that, on May 30, 2005, her husband had apparently washed a load of laundry and, as a result, the bucket contained water. (Tr. 160-161.) However, defendant stated that she did not discover that the bucket contained water until after her son nearly drowned. (Tr. 170-171.)
 {¶ 42} On May 30, 2005, after defendant checked on her children and after defendant's husband and her brother left the house, two children asked to watch a movie in the living room. (Tr. 162-163.) Defendant set up the television so that the children could watch a movie. Next, defendant went to check on the three-week-old twins and was followed by the child that later fell into the bucket and another child. (Tr. 163.) Later, the child that later fell into the bucket followed his sibling who left to go to another part of the house. (Tr. 164.) Defendant remained in the room with the infant twins. (Tr. 165.) After checking on the other children, defendant again attended to the infant twins. (Tr. 165-166.) According to defendant, she heard a scream "like I never heard before, which made me rise up." (Tr. 166.) Defendant then found an older child with the lifeless body of a younger sibling in his hands. (Id.) Defendant instructed the older child to dial 911. Defendant also observed that the body of the seemingly lifeless child was wet. Defendant laid this child on a coffee table and began CPR. (Tr. 167-168.) Shortly thereafter emergency medical personnel arrived at the home. After defendant began CPR, she asked the older child what had transpired to cause the emergency. According to defendant, "[the older child] told me that he went in the kitchen to get some water and he looked and he seen [his sibling] hanging over the bucket, and that's when everything happened." (Tr. 170.) After emergency medical personnel stabilized her son, defendant accompanied her son to the hospital. (Tr. 172.)
 {¶ 43} At trial, defendant admitted that she did not have the "cleanest house on the block." (Tr. 173.) Defendant explained that her children were assigned chores and that their failure to complete these assigned chores contributed, in part, to the home's condition. Defendant also explained that, at the time her child nearly drowned, her youngest children were approximately three weeks old and she had been "on bed rest" for "about three to four months" before these children were born. (Tr. 183.) Defendant admitted that it is "hard to run a household with nine children when you're on bed rest[.]" (Id.)
 {¶ 44} Defendant further explained that mattresses in the children's rooms lacked bedding because the children would use the sheets as "capes" while they jumped from bed to bed. (Tr. 176.) However, according to defendant, before the children retired for the evening, bed linens would be placed on the mattresses for the children. Defendant disputed Officer Haley's assessment that the urine and feces in the training potties had been in the potties for an extended time (Tr. 181), and that her kitchen refrigerator had an odor (Tr. 183). As to the chest freezer in the living room, defendant explained that when flooring had been replaced, the freezer had been placed in the living room; however, because the freezer was inoperable, she intended to dispose of it. (Tr. 184.) Defendant further claimed that, even though the freezer was not locked, her younger children could not climb into the freezer and her older children would not play with it. (Tr. 185.) However, defendant did admit that she had not talked with her children about the dangers of playing in the deep freezer. (Id.) According to defendant, the freezer had been in the living room for just one day. (Tr. 185.)
 {¶ 45} Defendant also denied that on May 30, 2005, her home was infested with roaches (Tr. 200), and with mice (Tr. 201). However, prior to May 30, 2005, defendant was aware of a mice infestation. (Id.) When queried if she was aware that before May 30, 2005, she had roach problems, defendant answered: "Yes and no." (Tr. 200.)
 {¶ 46} Defendant disagreed with Officer Haley's assessment that a foul odor emanated from the chest freezer in the living room when it was opened. (Tr. 202-203.) Defendant also disputed whether an odor came from her kitchen refrigerator. (Tr. 203.) Defendant further disputed Officer Haley's assessment that food in the refrigerator was spoiled. (Tr. 203-204.) Defendant also testified that she was not aware of a strong smell of urine in the upstairs portion of her home. (Tr. 204.)
 {¶ 47} In a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
* * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long
(1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright,
Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18.
 {¶ 48} Based on our review of the evidence, in the present case, we find that the jury, as the trier of fact, reasonably could conclude that defendant recklessly created a substantial risk to the health and safety of her children by violating a duty of care, protection, or support.
 {¶ 49} Here, according to the testimony of Officers Haley and Hall, the following conditions, among others, were present in the home: the refrigerator in defendant's home lacked edible food; the refrigerator contained spoiled food; the refrigerator was dirty and malodorous; cockroaches crawled among the family's dishes, including dishes in the cabinets and elsewhere within the home; vermin was present in the home; urine and feces in potty training toilets appeared to have been in these toilets for an extended time; a smell of urine pervaded the house; a smell of dog feces and urine was present in the basement; chicken bones were in the basement; and there was staining on mattresses. Such conditions support a reasonable conclusion that conditions in the home were less than sanitary. See, e.g., State v. Caton (2000),137 Ohio App.3d 742, 751-752 (observing that "[i]t is a simple rule of hygiene that germs and bacteria breed in filth and excrement" and "[i]nsects are known to harbor and transmit disease").
 {¶ 50} Furthermore, the testimony of Officers Haley and Hall supports a reasonable conclusion that the children were not well cared for on the day that police officers were in the home. According to the police officers' testimony, infants had yellowed and sagging diapers; the children and their clothing appeared soiled; and there was no edible food in the house. Furthermore, besides the unsanitary conditions in the home, according to the testimony of Officers Hall and Haley, a bucket with water was accessible to defendant's toddler son, thereby creating a hazard, as this child fell into the bucket and nearly drowned.
 {¶ 51} We find that the testimony of the police officers, if believed by the trier of fact, establishes that defendant perversely disregarded a known risk to the children's care, protection, or support. Based upon the police officers' testimony, the jury could reasonably infer that defendant was aware of the home's unsanitary conditions and took no action to ameliorate the harmful conditions. See, e.g., Caton, supra, at 752-753.
 {¶ 52} Accordingly, construing the evidence in favor the prosecution, we conclude that the record contains sufficient evidence to permit any rational trier of fact to find the essential elements of endangering children beyond a reasonable doubt. Moreover, after reviewing the evidence, we also conclude that defendant's conviction is not against the manifest weight of the evidence.
 {¶ 53} Therefore, for the foregoing reasons, we overrule defendant's first assignment of error.
 {¶ 54} Defendant's second assignment of error asserts that the trial court provided an incomplete and erroneous jury instruction and, as a consequence, committed reversible error.
 {¶ 55} Crim.R. 30(A) provides, in part, that "[o]n appeal, a party may not assign as error the giving or failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection."[3] See, also, State v.Parra (1980), 61 Ohio St.2d 236, 238.[4]
 {¶ 56} In State v. Davis, Franklin App. No. 05AP-193,2005-Ohio-6810, this court explained:
Ordinarily, as Crim.R. 30(A) provides, a party may not assign as error the giving of, or the failure to give, any instruction unless the party makes a timely objection thereto. The only exception to this waiver provision is where there is plain error or a defect affecting a substantial right. Crim.R. 52(B). We are to invoke the plain error doctrine only in exceptional circumstances to prevent a manifest miscarriage of justice.State v. Long (1978), 53 Ohio St.2d 91, 94-95. An instruction does not constitute plain error unless, but for the error, the outcome of the trial would clearly have been different. State v.Ballew (1996), 76 Ohio St.3d 244, 251; State v. Rice (Mar. 26, 1987), Franklin App. No. 86AP-911.
Id. at ¶ 34. See, also, Parra, supra, at 238.
 {¶ 57} Nevertheless, even if a forfeited error satisfies Crim.R. 52(B), "Crim.R. 52(B) does not demand that an appellate court correct it." State v. Barnes (2002), 94 Ohio St.3d 21,27. "Crim.R. 52(B) states only that a reviewing court `may' notice plain forfeited errors; a court is not obliged to correct them." Id.
 {¶ 58} Here, defendant failed to object to the trial court's jury charge. (Tr. 267.) Therefore, defendant has waived any purported error that may have resulted from the jury instruction, unless such error rises to the level of plain error.
 {¶ 59} In her second assignment of error, defendant asserts that the trial court's failure to provide guidance as to what constitutes "violating a duty of care, protection or support" constituted a confusing jury instruction and invited jurors to apply a purely subjective individual standard, thereby violating due process protections. In its jury charge, the trial court instructed, among other things, that:
* * * Before you can find the defendant guilty, you must find, beyond a reasonable doubt, that on or about the 30th day of May, 2005, and in Franklin County, Ohio, the defendant, being the parent of children, recklessly created a substantial risk to the health or safety of a child or children by violating a duty of care, protection or support. * * *
(Tr. 261.)
 {¶ 60} "Where an instruction is claimed to be `ambiguous and therefore subject to an erroneous interpretation,' the court must inquire `whether there is a reasonable likelihood that the jury has applied the challenged instruction' incorrectly." State v.Herring (2002), 94 Ohio St.3d 246, 250, reconsideration denied,95 Ohio St.3d 1423, certiorari denied, 537 U.S. 917,123 S.Ct. 301, quoting Boyde v. California (1990), 494 U.S. 370, 380,110 S.Ct. 1190, rehearing denied, 495 U.S. 924, 110 S.Ct. 1961.
 {¶ 61} In State v. McKibbon (Apr. 26, 2002), Hamilton App. No. C-010145, the court explained:
A reviewing court may not reverse a conviction in a criminal case due to jury instructions unless it is clear that the jury instructions constituted prejudicial error. In determining whether a jury instruction constitutes prejudicial error, an appellate court must determine, from the record, whether such instruction may have resulted in a manifest miscarriage of justice. When a specific instruction is challenged on appeal, the instruction should not be judged in isolation; rather, it must be viewed in the context of the overall charge.
Id. (footnotes omitted); see, also, State v. Philpot,
Franklin App. No. 03AP-758, 2004-Ohio-5063, at ¶ 22; State v.Noggle (2000), 140 Ohio App.3d 733, 750, appeal dismissed as improvidently granted (2001), 91 Ohio St.3d 1280.
 {¶ 62} Here, when the jury charge is viewed as a whole, we cannot conclude that there is a reasonable likelihood that the jury misapplied the challenged instruction. Neither can we conclude that the challenged instruction constitutes a manifest miscarriage of justice. Furthermore, we cannot conclude that but for the purported error, the jury's verdict would have been otherwise. Therefore, for the foregoing reasons, we overrule defendant's second assignment of error.
 {¶ 63} Accordingly, in summary, we hold that defendant's conviction for endangering children is supported by sufficient evidence and is not against the manifest weight of the evidence, and the trial court's jury instruction was not incomplete or erroneous, or both. Therefore, both of defendant's assignments of error are overruled, and the judgment of the Franklin County Municipal Court is affirmed.
Judgment affirmed.
Bryant and Brown, JJ., concur.
[1] Since defendant's conviction, (2006) Am. Sub. S.B. No. 53, and (2006) Sub. S.B. No. 8 amended R.C. 2919.22, effective May 17, 2006, and August 17, 2006, respectively. Division (A) of R.C.2919.22 was unaffected by these amendments.
[2] Because defendant's testimony established the facts to which the parties earlier stipulated, absent any objections by defendant, the state moved to withdraw the earlier stipulations. (Tr. 221.) The court granted the state's motion to withdraw the stipulations. (Id.)
[3] Crim.R. 30 was amended effective July 1, 2005. See, generally, Crim.R. 59(U) (providing that the 2005 amendments to Crim.R 30 "govern all proceedings in actions brought after they take effect and also all further proceedings in actions then pending, except to the extent that their application in a particular action pending when the amendments take effect would not be feasible or would work injustice, in which event the former procedure applies").
[4] In Parra, the Supreme Court stated, in part:
The philosophy embraced by Crim.R. 30 and its application was summarized by the late Chief Justice C. William O'Neill, inState v. Williams (1977), 51 Ohio St.2d 112, 116-117 * * * where he opined:
"This court need not address this proposition of law as the appellant failed to object to the jury instructions. * * * This court has consistently held that an appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. * * * `Any other rule * * * would relieve counsel from any duty or responsibility to the court and place the entire responsibility upon the trial court to give faultless instructions upon every possible feature of the case, thereby disregarding entirely the true relation of court and counsel which enjoins upon counsel the duty to exercise diligence and to aid the court rather than by silence mislead the court into commission of error.' See Crim.R. 30."
Id. at 238.